UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| SUN LAKES HIGHLAND, LLC, a Delaware limited liability company,<br><br>Petitioner and Plaintiff,<br><br>v.<br><br>CITY OF BANNING, a municipal corporation, et al.,<br><br>Respondents and Defendants. | Case No. 5:24-cv-02603-DTB<br><br>**ORDER GRANTING DEFENDANTS CITY OF BANNING AND SHERI FLYNN'S MOTION TO DISMISS THE THIRD AMENDED COMPLAINT** |

**I.**

**PROCEEDINGS**

On December 6, 2024, petitioner and plaintiff Sun Lakes Highland, LLC ("Plaintiff"), a Delaware limited liability company, filed a Petition for Writ of Mandate and Complaint, naming as respondents and defendants the City of Banning ("the City") and DOES 1 through 10, inclusive. (Docket No. 1). On January 7, 2025 (prior to the filing of a response), Plaintiff filed a First Amended Petition for Writ of

Mandate and Complaint, also naming as respondents and defendants the City and DOES 1 through 10, inclusive. (Docket No. 15). On March 19, 2025 (prior to the filing of a response), Plaintiff filed a "Motion for Leave to File Second Amended Petition/Complaint" ("Motion for Leave to Amend") (Docket No. 28), with the proposed Second Amended Petition for Writ of Mandate and Complaint attached thereto (Docket No. 28-2 at 2-56).[1] On March 25, 2025, the City filed a Non-Opposition to the Motion for Leave to Amend. (Docket No. 34). On March 31, 2025, the Court granted the Motion for Leave to Amend. (Docket No. 35).

On March 31, 2025 (in accordance with the Court's March 31, 2025 Order, see Docket No. 35), Petitioner filed a Second Amended Petition for Writ of Mandate and Complaint ("SAP"). (Docket No. 36).[2] The SAP named as defendants the City, Sheri Flynn ("Flynn"), a member of the City's City Council, and DOES 1 through 10, inclusive. (SAP at 1, 11). Defendant Flynn was sued in her individual capacity only. (SAP at 1, 11, 44).

On April 16, 2025, defendants the City and Flynn (collectively referred to herein as "Defendants") filed a Motion to Dismiss the SAP pursuant to Federal Rules of Civil Procedure 12(b)(1) ("Rule 12(b)(1)") and 12(b)(6) ("Rule 12(b)(6)"), on the

---

[1] For the parties' pleadings, the Court cites to the CM/ECF pagination at the top of each page.

[2] The mandate petition portion of the SAP sought a writ of administrative mandate against the City for (1) violations of Plaintiff's rights to procedural and substantive due process and to a fair hearing and (2) violations of California Government Code Section 65300, et seq. and the City's Municipal Code Sections 17.04.030, 17.48.020, 17.56.050 and 17.96.060. (SAP at 1, 32-38). As to the two claims in the mandate petition portion of the SAP, Plaintiff sought alternative and peremptory writs of mandate against the City. (SAP at 50).

The Complaint portion of the SAP alleged four claims, namely, (1) the denial of procedural and substantive due process under the Fourteenth Amendment (42 U.S.C. § 1983), (2) retaliation (42 U.S.C. § 1983), (3) de facto taking (42 U.S.C. § 1983), and (4) declaratory relief. (SAP at 1, 4, 38-50). While all claims in the Complaint portion of the SAP were alleged against the City, only the second claim in the Complaint portion of the SAP (retaliation) was alleged against defendant Flynn. (SAP at 38, 44, 46, 48). As to the four claims in the Complaint portion of the SAP, Plaintiff sought, among other things, compensatory damages and declaratory relief.[2] (SAP at 50-53).

grounds that the Court lacked subject matter jurisdiction over the two claims alleged in the mandate petition portion of the SAP and that the Complaint portion of the SAP failed to state a viable claim for relief. (Docket No. 42). As support for the Motion to Dismiss the SAP, Defendants filed a request that the Court take judicial notice of eleven attached exhibits[3] (Docket No. 43; "RJN No. 1"), which the Court later granted. (Docket No. 81 at 4 n.4).

The City filed an Answer to the SAP on April 16, 2025. (Docket No. 45). Flynn filed an Answer to the SAP on April 29, 2025. (Docket No. 47).

On May 8, 2025, Plaintiff filed an Opposition to the Motion to Dismiss the SAP (Docket No. 48). Defendants filed a Reply to the Opposition to the Motion to Dismiss the SAP on May 15, 2025. (Docket No. 13).[4]

On December 5, 2025, the Court issued an Order granting the Motion to Dismiss the SAP. (Docket No. 81). Finding that the two claims in the mandate portion of the SAP were time barred and that the four claims in the Complaint portion of the SAP failed to state plausible claims for relief, the Court granted the Motion to Dismiss the SAP, dismissed the two claims in the mandate portion of the SAP with

/ / /

/ / /

---

[3] The exhibits were: (1) Banning Municipal Code ("BMC") section 17.56.020; (2) BMC section 17.68.140; (3) Banning City Council Resolution 2024-151; (4) Banning City Council Resolution 2024-151; (5) Banning Manual of Procedural Guidelines section 10.3(d), amended by Banning City Council Resolution 2024-16; (6) letter from Plaintiff to Banning City Council, dated July 25, 2024; (7) Banning City Council Regular Meeting Minutes (without attachments), dated October 8, 2024; (8) Sun Lakes Village North Specific Plan, Amendment Number 5, Table 1 (Allowable Land Uses); (9) Ruling on Petition for Writ of Mandate/Complaint for Injunctive Relief in Pass Action Group v. City of Banning et al., Riverside County Superior Court, Case No. CVRI2201482, dated March 14, 2024, and Judgment, filed on April 9, 2024; (10) Proof of Service of Summons and Complaint, dated December 11, 2024, in Sun Lakes v. City of Banning, Case No. 5:24-cv-02603-DTB; and (11) BMC section 17.56.050.

[4] On August 1, 2025 (following issuance of the Court's May 13, 2025, Standing Order, see Docket No. 49), the City filed the Certified Administrative Record. (Docket Nos. 53-76).

prejudice and without leave to amend, and dismissed the four claims in the Complaint portion of the SAP without prejudice and with leave to amend. (Id. at 16-30).[5]

On January 5, 2026 (pursuant to the Court's Order granting the Motion to Dismiss the SAP, see Docket No. 81 at 30), Plaintiff filed a Third Amended Complaint ("TAC"), naming as defendants the City, Flynn, and DOES 1 through 10 inclusive. (Docket No. 82).[6] Defendant Flynn is sued in her individual capacity only. (TAC at 1, 13, 50).

The gravamen of the TAC is that actions by Defendants have impermissibly denied Plaintiff the ability to develop property purchased by Plaintiff in 2021. (See TAC at 4-41). The TAC alleges the following claims: (1) The denial of procedural and substantive due process under the Fourteenth Amendment (42 U.S.C. § 1983), against the City; (2) retaliation (42 U.S.C. § 1983), against Defendants; (3) de facto taking (42 U.S.C. § 1983), against the City, and (4) declaratory relief, against the City. (TAC at 1, 41-56). Plaintiff seeks, among other things, compensatory damages and declaratory relief. (TAC at 56-58).

On February 6, 2026, Defendants filed a Motion to Dismiss the TAC pursuant to Rule 12(b)(1) and Rule 12(b)(6). (Docket No. 88). The Motion to Dismiss the TAC is based on the grounds that Plaintiff has failed to state plausible claims for relief and that the Court does not have subject matter jurisdiction over the de facto

/ / /

/ / /

/ / /

---

[5] On January 14, 2026, the Court denied Defendants' Motion to Stay Discovery, filed on October 24, 2025 (see Docket No. 77). (Docket No. 86).

[6] Attached to the TAC as an exhibit is "Amendment No. 5 to Sun Lakes Village North Specific Plan," adopted on December 8, 2020. (TAC at 2-42; see id. at 4).

takings claim. (Id.). Attached to the Motion to Dismiss the TAC is Defendants' request that the Court take judicial notice of one attached exhibit. (Docket No. 88-1).[7]

Also on February 6, 2026, Defendants filed Answers to the TAC. (Docket Nos. 88-89).

On March 5, 2026, Plaintiff filed an Opposition to the Motion to Dismiss the TAC ("Opposition") (Docket No. 95), accompanied by the supporting Declaration of Andrew A. Wood with attached exhibits (Docket No. 95-1).[8]

On March 12, 2026, Defendants filed a Reply to the Opposition ("Reply"). (Docket No. 97). [9]

For the reasons set forth below, the Court GRANTS Defendants' Motion to Dismiss the TAC.

/ / /

/ / /

---

[7] Defendants request that the Court take judicial notice of Plaintiff's application for a mixed use project of warehouse space and commercial space at NEC Sun Lakes Boulevard and Sun Lakes Village Drive, signed on September 26, 2024 (see Docket No. 88-1 at 5-11).

Plaintiff has not opposed the request for judicial notice. The request for judicial notice is GRANTED. See Harris v. County of Orange, 682 F.3d 1126, 1132 (9th Cir. 2012) (Federal Rule of Evidence 201 permits a court to "take judicial notice of undisputed matters of public record"); United States v. Black, 482 F.3d 1035, 1041 (9th Cir. 2007) (public records, including court documents, are proper subjects of judicial notice); Fed. R. Evidence 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.")

[8] The exhibits are: (1) A redline comparison of the TAC to the SAP (see Docket No. 95-1 at 4-80); and (2) Section 2.55 H ("Consistency with General Plan") of California Land Use Practice (2025) Update, published by Continuing Education of the Bar (see Docket No. 95-1 at 82).

[9] On February 6, 2026, the City filed a Motion to Stay Discovery. (Docket No. 89). However, based on the "Stipulation and Joint Request to Stay Discovery Pending the Court's Ruling on Defendants' Motion to Dismiss the Third Amended Complaint," filed on October 14, 2026 (Docket No. 99), the City's Motion.to Stay Discovery was withdrawn and denied as moot. (Docket No. 100).

## II.

## SUMMARY OF THE FACTUAL ALLEGATIONS IN THE TAC

In April 2021, Plaintiff purchased approximately 47 acres of undeveloped, commercially zoned property ("the Banning Point property") within the Sun Lakes Village North Specific Plan area of the City, commonly known as the "Sun Lakes Community." (TAC, ¶¶ 3, 13). Although the majority of the Sun Lakes Village North Specific Plan, which is comprised of roughly 963 acres, has been developed for decades, the City, allegedly due to the influence of the Sun Lakes Community, has not allowed development of the Banning Point property, resulting in the City's banking of the property for the benefit of the City and the Sun Lakes Community. (Id., ¶¶ 3, 10, 13, 15, 18, 23, 35, 37, 32-34, 54, 57).

In December 2020, the City, in consultation with Plaintiff, unanimously amended, without any challenge, and without any opposition from the Sun Lakes Community, the Specific Plan (commonly referred to as "Amendment No. 5"), to establish three land-use districts for the Banning Point property, as follows: (1) The Business & Warehouse District, consisting of approximately 30.22 acres; (2) the Office & Professional District, consisting of approximately 10.06 acres; and (3) the Retail & Service District, consisting of approximately 6.83 acres. (Id., ¶¶ 2, 4, 14, 38-39; see Docket No. 82-1). Amendment No. 5 was created with the anticipation that Plaintiff would submit for approval a mixed use project that would provide a significant boost to the economically depressed area. (TAC, ¶¶ 1, 38; see Docket No. 82-1 at 9). Amendment No. 5 contains Development Standards and Design Guidelines for the Banning Point property. (TAC, ¶¶ 40; see Docket No. 82-1 at 23-33).

In early 2021, Plaintiff submitted an application to the City to develop the Banning Point property, specifically, a 619,959 square-foot industrial warehouse with 10,000 square feet of office space and six commercial/retail buildings totaling

approximately 34,000 square feet. (TAC, ¶¶ 14, 46).[10] The proposed project would take place over two phases; the first would involve the development of the light industrial warehouse; and the second would involve the development of the retail/restaurant buildings. (Id., ¶ 46). According to Plaintiff, Plaintiff submitted for Design Review a project that fit within Amendment 5's parameters. (Id., ¶¶ 4, 6).

Over the next several months, the City reviewed Plaintiff's application, including an application for Design Review (No. 21-7008), a Tentative Parcel Map approval (No. 38164), and the project's California Environmental Quality Act ("CEQA") document, an addendum to the previously approved Environmental Impact report for Amendment No. 5. (Id., ¶ 47). On October 19, 2021, the City Planning Commission, which has limited discretion to approve or deny design review,[11] held a public hearing to consider the project. (Id., ¶¶ 5, 44, 48). Flynn, believed to be a resident of the City beginning in 2019, as well as the founder and executive board member of Pass Action Group ("PAG"), and other PAG members, expressed opposition to the project. (Id., ¶¶ 16, 48-49, 53).

/ / /

---

[10] BMC section 17.56.020 requires the filing of an application for Design Review for "new development projects, redevelopment projects, or projects involving an intensification of land use." (RJN No. 1, Exhibit 1).

[11] BMC section 17.56.50 requires the City Planning Commission to determine whether a "project adequately meets adopted City performance standards and design guidelines, based upon the following findings: A. The proposed project is consistent with the General Plan.[:] B. The proposed project is consistent with the Zoning Ordinance, including the development standards and guidelines for the district in which it is located.[;] C. The design and layout of the proposed project will not unreasonably interfere with the use and enjoyment of neighboring existing or future development, and will not result in vehicular and/or pedestrian hazards.[;] D. The design of the proposed project is compatible with the character of the surrounding neighborhood." (RJN No. 1 at 78; TAC, ¶ 42).

BMC section 17.040.070 defines "design" to include "the planning and engineering of the following: street alignments and grades thereof; location and size of all required easements and rights-of-way; fire roads and fire breaks; lot size and configuration; traffic access; grading; land to be dedicated for park or recreational purposes; building and other such specific physical requirements." (TAC, ¶¶ 5, 43).

At a continued hearing on December 1, 2021, the City Planning Commission, after further public comment, voted to accept the City staff's recommendation to approve the Design Review and to recommend that the City Council approve the Tentative Parcel Map. (Id., ¶ 50).

The PAG appealed. (Id., ¶ 51). On February 17, 2022, all but one of the City Councilmembers (Councilmember Hamlin) voted to deny the PAG appeal and approve the project, including the approval of the Design Review and Tentative Parcel Map and the adoption of the project's CEQA Addendum. (Id., ¶¶ 17, 52).

On April 18, 2022, PAG, with Flynn as its representative, filed a lawsuit in Riverside County Superior Court against the City (naming Plaintiff as a real party in interest), alleging that: (1) The City failed to comply with the CEQA by not preparing a subsequent or supplemental environmental impact report; (2) Councilmember Hamlin was biased and tainted by the City Council's decision-making process; and (3) the findings for approving the Design Review and Tentative Parcel Map were unsupported by substantial evidence. (Id., ¶¶ 17, 55). The lawsuit did not challenge Amendment No. 5. (Id., ¶¶ 7, 55).

During the pendency of the suit, Flynn launched a campaign to hold a special election to recall Councilmember Hamlin. (Id., ¶¶ 7, 56). By September 2022, Flynn had successfully forced Councilmember Hamlin's resignation. (Id., ¶¶ 7, 57). Soon thereafter, Flynn began to campaign for election to the City Council, with the stated goal of not approving or allowing any warehouses to be located in residential communities, which included the Banning Point project. (Id., ¶¶ 57-59). Flynn considers the Banning Point project to be incompatible "with its residential surroundings." (Id., ¶ 59). On December 13, 2022, Flynn was elected to the City Council. (Id., ¶ 60).

On March 15, 2024, the Riverside County Superior Court found that Councilmember Hamlin, who had voted against the approval of the project, had made

public statements that gave rise to an unacceptable risk of bias (but rejected PAG's other arguments). (Id., ¶¶ 8, 61-62; see RJN No. 1, Exhibit 9 ). The Superior Court issued a writ of mandate directing the City to vacate and set aside the project approvals considered at a hearing by Councilmember Hamlin and to ensure that any future hearings related to project approvals be conducted without the participation of Councilmember Hamlin. (Id., ¶¶ 8, 63; see RJN No. 1, Exhibit 9).

The City Council scheduled a public hearing for July 9, 2024, to vacate and set aside the 2022 project approvals and to reconsider the project without the participation of Councilmember Hamlin. (Id., ¶ 65). On July 3, 2024 (prior to that hearing), Flynn spoke at a PAG meeting and urged its members to attend the July 9 meeting to oppose the project, "cajoled" them to send letters to the City Council, and instructed them how to ensure their comments were included as part of the record. (Id., ¶¶ 8, 66-67, 83). Flynn also told the PAG members she had no intention of recusing herself, that California's Political Fair Practices Commission had blessed her refusal to recuse herself (which was false), and that she had an obligation to let people know her stance on the project. (Id., ¶¶ 8, 20, 67, 87).

At the July 9, 2024 public hearing, Flynn openly echoed PAG's anti-growth agenda, reading from a pre-prepared list of questions and statements that were identical to the baseless claims in PAG's lawsuit against the City. (Id., ¶ 71). Flynn also questioned Plaintiff's representative about a "rumor" regarding a 2019 $4,000,000 contribution into a City "housing authority fund" – an untrue rumor – to imply that Plaintiff was attempting to "buy" councilmember votes for the project before the 2022 hearing. (Id., ¶ 72). Flynn's badgering was threatening in light of her suppression of residents' dissenting views on her social media page. (Id., ¶ 73). At the July 9, 2024 hearing, Councilmember Minjares, who Flynn had previously warned was not able to fine council members for making "disparaging remarks" about other council members, and Councilmember Happe, who had previously voted

to adopt the necessary findings to approve the project and who Flynn had opposed for reappointment for "unlimited" warehouses "Zero feet away" from sensitive areas, felt compelled to oppose the project; and Flynn and Councilmembers Minjares and Happe "provided nothing but unfounded opinions to support their opposition to the project." (Id., ¶¶ 74-76, 78; see also id., ¶ 19). Rather than deny the project, the City Council continued the matter and directed staff to prepare a resolution of the denial of the Design Review approval only, based on the following: "[T]he project is inconsistent with the City's General Plan because: (i) 'the circulation element of their design sucks . . .,' (ii) 'the project will not provide a nonpolluting industrial use and will not provide jobs for city residents,' and (iii) the project 'does not protect residential neighborhoods from potentially significant sources of community noise'"; "the project will unreasonably interfere with the use and enjoyment of neighboring existing or future development and will result in vehicular or pedestrian hazards because 'there are no protections for pedestrian or golf cars using Sun Lakes Boulevard and connecting it to the project or the project to Sun Lakes'"; and "the project is incompatible with the character of the surrounding neighborhood because: (i) 'its proximity to sun lakes, its only 800 ft. from residential,' (ii) the project site is 'landlocked by residential,' and (iii) 'the easterly parcel will not be provided with substantial screening and buffering of the residential and assisted living uses to the east of the building.'" (Id., ¶ 79).[12] This was done despite the knowledge that the Banning Point property was never zoned for residential and that the Specific Plan, as amended, allowed for the project, and despite Flynn's acknowledgment in a July 2025

---

[12] At the July 9, 2024 hearing, the City adopted Resolution 2024-113, which states, in pertinent part, that "[t]he City Council hereby sets aside and vacates its previous approval of Tentative Parcel map 38164, approval of Design Review 21-7008 and denial of the appeal of the Planning Commission's approval of Design Review 21-7008, and adoption of an addendum, all in connection with the Banning Point project, and rescinds City Council Resolution 2022-14. (RJN No. 1, Exhibit 3).

Facebook post that the Banning Point property was zoned Commercial/Retail until it was changed to allow industrial warehouses in December 2020 and that Banning Point Property was never zoned for residential. (Id., ¶¶ 45, 80).

In a letter dated July 25, 2024, Plaintiff informed the City's mayor and the City Council of Flynn's pre-hearing bias and commitment to oppose the project. (Id., ¶ 84).[13] The City did not take any action to conduct a new, fair and unbiased hearing on the project. (Id.).

On August 29, 2024, PAG's attorney sent a letter to, among others, the City's mayor and the City Council in an attempt to support defendant Councilmember Flynn's participation in the July 9, 2024 public hearing and the findings for the denial of the project. (Id., ¶¶ 85). On September 9, 2024, Plaintiff responded to the letter, alleging that PAG's legal and factual allegations in the August 29, 2024 letter were baseless. (Id., ¶ 86). The City did not take any action to conduct a new, fair and unbiased hearing on the project. (Id.).

On September 10, 2024, the City Council held another hearing on the project. (Id., ¶ 88). The City Council considered three resolutions prepared by City staff -- one approving the Design Review approval, the Tentative Parcel Map, and the project (Resolution 2024-149); one approving the Tentative Parcel Map but denying the Design Review approval (Resolution 2024-150); and one denying the project (Resolution 2024-151). (Id.). The City Council adopted Resolution 2024-151. (Id., ¶ 89; see also id., ¶ 19 ["On information and belief, Councilmember Flynn's personal animus toward the project tainted the City Council's July 9, 2024, public hearing at which the City reconsidered the project, based on the Superior Court's order, and the

[13] In that letter, Plaintiff demanded that Councilmembers Flynn and Happe recuse themselves from all future City Council hearings on the project based on their biases, that the City vacate and set aside all action taken at the July 9, 2024 hearing, including direction given to City Council staff to prepare a resolution, that the City hold a new, fair and unbiased hearing on the project, and that the remaining Councilmembers approve the project. (RJN No. 1, Exhibit 6).

subsequent hearing on September 10, 2024, that ultimately resulted in the adoption of Resolution 2024-151, wrongfully denying [Plaintiff] the entitlements needed to proceed with development of the Banning Point project."]).[14]

On September 25, 2024, Plaintiff formally requested that the City Council reconsider its adoption of Resolution 2024-151 by noticing a new public hearing as permitted by BMC section 17.68.140. (Id., ¶ 90).[15] Plaintiff's reconsideration request provided additional evidence of Flynn's bias, and was based, in part, on Flynn's refusal to recuse herself at the July 9, 2024 hearing and the September 10, 2024 denial of the project. (Id., ¶¶ 90-91).[16] Instead of recusing herself from any deliberation over the request for reconsideration, Flynn injected herself into the discussion to ensure denial of the reconsideration request. (Id., ¶¶ 9, 92).

/ / /

---

[14] On September 10, 2024, the City Council adopted Resolution 2024-151, with Councilmembers Flynn, Happe, and Minjares voting for it and Councilmembers Sanchez and Wallace voting against it. (RJN No. 1, Exhibit 4). In that Resolution, based on the findings that "[t]he design and improvement of the subdivision proposed under Tentative Parcel Map No. 38164 is inconsistent with the City's General Plan and the Sun Lakes Village North Specific Plan Amendment No. 5," "[t]he Project is inconsistent with the General Plan," "[t]he proposed project conflicts with and is inconsistent with one of the purposes of the City's Design Review process which is to maintain the public health, safety and welfare and property throughout the City," "[t]he design and layout of the proposed project will unreasonably interfere with the use and enjoyment of neighboring existing or future development," "[t]he design and layout of the proposed project will result in vehicular and/or pedestrian hazards," and "[t]he design of the proposed project is incompatible with the character of the surrounding neighborhood," the City Council disapproved of the Tentative Parcel Map and upheld the appeal of the Planning Commission's approval of the Design Review. (Id.).

[15] BMC section 17.68.140 permits the filing of a request for reconsideration "within fifteen days following the final date of action." (RJN No. 1, Exhibit 2).

Under the City's Manual of Procedural Guidelines section 10.3(d), any City Councilmember "who voted with the majority may move to reconsider any action at the same meeting or at an adjourned meeting following the meeting at which the action was taken, provided that reconsideration shall not be permitted where a party other than the City has acted in reliance on [the City Council's] action and would be substantially prejudiced by such reconsideration."

[16] On September 26, 2024 (the day after Plaintiff requested reconsideration), Plaintiff submitted an application for a mixed use project of warehouse space and commercial space at NEC Sun Lakes Boulevard and Sun Lakes Village Drive. (Docket No. 88-1 at 5-11).

On October 8, 2024, the City Council held a hearing on Plaintiff's request for reconsideration. (Id., ¶¶ 93). Although Councilmember Happe initially questioned whether the City Council was conflicted from considering the reconsideration request in light of the allegations of bias, the City Council, based on assurances from the City Attorney, considered the reconsideration request. (Id.). During public comment, residents of Sun Lakes wanted to know why Plaintiff got to request reconsideration; and Community Development Director David Newell noted that it was "part of the due process in the Municipal Code" and that "[t]his was not directed by any staff member[.]" (Id., ¶ 95). When Councilmember (and Mayor Pro Tempore) Minjares asked whether the City Council wanted to move forward with reconsideration, Flynn allegedly berated the City Council until Councilmember Minjares withdrew the motion. (Id., ¶ 96). Following an off-the-record recess and following Councilmember Happe's statement that "I have nothing to add to the defense of" Flynn and Councilmember Happe's acknowledgment that Plaintiff had a due process right to request reconsideration, the City Council confirmed the end of the proceedings as a denial of Plaintiff's request to reconsider. (Id., ¶¶ 97-98; see also id., ¶¶ 9, 21). "The minutes of the meeting further reflect that [Councilmember] Minjares brought the motion, that it was seconded, and that in association with a 14+ minute recess the motion was withdrawn with no explanation." (Id., ¶ 99).[17]

The City's and Flynn's actions against Plaintiff were retaliatory in nature. (Id., ¶¶ 19 ["Indeed, Councilmember Flynn's influence and personal animus caused the

[17] The minutes of the October 8, 2024 reflect Plaintiff's request for reconsideration came up for discussion, that after the City's Community Development Director's presentation of the staff report and after public comment, the motion was called by Mayor Pro Tem Minjares, was seconded by Mayor Sanchez, and was withdrawn by Mayor Pro Tem Minjares, that there was a recess from 8:22 p.m., that the meeting was reconvened at 8:36 p.m., and that following the meeting's reconvening are the following statements: "**No motion to reconsider. The request is denied.**" (RJN No. 1, Exhibit 7 at 52-53; bolding in original).

City, through Councilmember Flynn and other city officials doing her bidding, to retaliate directly against [Plaintiff] for having advocated for its project, opposed PAG's litigation, and fought against the *de facto* taking of the property. Flynn and the City's retaliation included the denial of design review for [Plaintiff's] project (and later refusal to reconsider that denial) despite the project conforming with the specific plan that the Council had earlier amended to facilitate SLH's project—retaliatory conduct that would chill any person of ordinary firmness from continuing to engage in protected free speech activity."], 21, 22 ["Again, the City's and Flynn's actions were taken in retaliation for [Plaintiff's] having exercised its First Amendment rights and to ensure that the Banning Point Property is never developed for any economically viable use, and is instead banked for future use as an amenity, like a park, for the City's and Sun Lakes residents' enjoyment."]).

On December 10, 2024, Flynn was reelected and sworn in as a Councilmember for four years (until 2028). (Id., ¶ 101). The same day, under BMC section 2.04.070, the new City Council appointed Flynn as the City's mayor. (Id., ¶¶ 10, 22, 101). As mayor, Flynn is the head of the City Council and is the "designated representative" for "expressing the official City position on an issue." (Id., ¶ 101).

## III.

## STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(1) is based on the alleged lack of subject matter jurisdiction. A Rule 12(b)(1) attack on jurisdiction can be facial or factual. Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir. 2004) (citation omitted). "In a facial attack, the challenger asserts that the allegations in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." Id. In considering a Rule 12(b)(1) motion to dismiss, a court must accept all factual allegations as true. Miranda v. Reno, 238

F.3d 1156, 1157 n.1 (9th Cir. 2001). "[A] Rule 12(b)(1) motion can attack the substance of a complaint's jurisdictional allegations despite their formal sufficiency, and in doing so rely on affidavits or any other evidence properly before the court." St. Clair v. City of Chico, 880 F.2d 199, 201 (9th Cir. 1989).

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of claims alleged in a complaint. A complaint may be dismissed for failure to state a claim for two reasons: (1) Lack of a cognizable legal theory; or (2) insufficient facts under a cognizable legal theory. Mendiondo v. Centinela Hosp. Med. Ctr., 521 F.3d 1097, 1104 (9th Cir. 2008) (citation omitted). To survive a Rule 12(b)(6) motion, a plaintiff must allege facts sufficient to state a claim that is plausible on its face. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is facially plausible when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 556). Plausibility does not mean probability but does require "more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 566 U.S. at 678. A pleading that offers mere "labels and conclusions" or "a formulaic recitation of a cause of action's elements will not do." Twombly, 550 U.S. at 555; see also Whitaker v. Tesla Motors, Inc., 985 F.3d 1173, 1176 (9th Cir. 2021) ("Taken together, Iqbal and Twombly require well-pleaded facts, not legal conclusions . . . that 'plausibly give rise to an entitlement to relief' . . . . The plausibility of a pleading thus derives from its well-pleaded factual allegations.") (quoting Iqbal, 556 U.S. at 679).

In considering a motion to dismiss, a court must accept all factual allegations in the complaint as true "and construe the pleadings in the light most favorable to the nonmoving party." Knievel v. ESPN, 393 F.3d 1068, 1072 (9th Cir. 2005). But the liberal pleading standard "applies only to a plaintiff's factual

allegations." Neitzke v. Williams, 490 U.S. 319, 330 n.9 (1989). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Iqbal, 556 U.S. at 678; see also Ileto v. Glock Inc., 349 F.3d 1191, 1200 (9th Cir. 2003) ("[W]e do not accept any unreasonable inferences or assume the truth of legal conclusions cast in the form of factual allegations."). "[A] liberal interpretation of a civil rights complaint may not supply essential elements of the claim that were not initially pled." Bruns v. Nat'l Credit Union Admin., 122 F.3d 1251, 1257 (9th Cir. 1997) (citation omitted).

A court may consider exhibits attached to a complaint and incorporated by reference. See Petrie v. Electronic Game Card, Inc., 761 F.3d 959, 964 n.6 (9th Cir. 2014). However, a court is not required to accept as true allegations contradicted by exhibits attached to a complaint or conclusory allegations, unwarranted deductions of fact, or unreasonable inferences. Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001). While on a Rule 12(b)(6) motion a court cannot consider evidence outside the pleadings, a court may "consider unattached evidence on which the complaint 'necessarily relies' if: (1) [T]he complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the document." United States v. Corinthian Colls., 655 F.3d 984, 999 (9th Cir. 2011) (citation omitted).

Rule 12(b)(6) is read in conjunction with Rule 8(a). Zixiang Li v. Kerry, 710 F.3d 995, 998-99 (9th Cir. 2013). A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8(a)(2). While Rule 8 does not require detailed factual allegations, a complaint, at a minimum, must allege enough specific facts to provide both "fair notice" to a defendant of the particular claim being asserted and "the grounds upon which [that claim] rests." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 & n.3 (2007) (citation omitted); see also Iqbal, 556 U.S. at 678 (Rule 8 pleading standard "demands more

than an unadorned, the-defendant-unlawfully-harmed-me accusation"); Schmidt v. Herrmann, 614 F.2d 1221, 1224 (9th Cir. 1980) (upholding Rule 8 dismissal of "confusing, distracting, ambiguous, and unintelligible pleadings").

If a court finds that a complaint should be dismissed for failure to state a claim, the court has discretion to dismiss with or without leave to amend. See Lopez v. Smith, 203 F.3d 1122, 1126-30 (9th Cir. 2000) (en banc). Leave to amend should be granted if it appears possible that the defects in the complaint could be corrected, especially if a plaintiff is pro se. Id. at 1130-31; see also Fed.R.Civ.P. 15(a)(2) ("The court should freely give leave to amend [a pleading] when justice so requires."). However, if, after careful consideration, it is clear that a complaint cannot be cured by amendment, a court may dismiss without leave to amend. See Ebner v. Fresh, Inc., 838 F.3d 958, 968 (9th Cir. 2016) (Rule 15's liberal amendment policy "does not apply when amendment would be futile"); Chaset v. Fleer/Skybox Int'l, 300 F.3d 1083, 1088 (9th Cir. 2002) (holding that "there is no need to prolong the litigation by permitting further amendment" where the "basic flaw" in the pleading cannot be cured by amendment); see also Miller v. Rykoff-Sexton, Inc., 845 F.2d 209, 214 (9th Cir. 1988) ("[A] proposed amendment is futile only if no set of facts can be proved under the amendment that would constitute a valid claim or defense.") (citation omitted).

## IV.

## DISCUSSION

### A. The Motion to Dismiss the TAC is Granted.

Defendants contend that the TAC should be dismissed because the four claims alleged in the TAC fail to state a plausible claim for relief. (Motion to Dismiss the TAC at 15-31). Plaintiff contends that each claim alleged in the TAC states a plausible claim for relief. (Opposition at 7-9, 14-27).

/ / /

1. Plaintiff has Failed to State Plausible Claims for Relief.

a. Procedural and Substantive Due Process Violation (42 U.S.C. § 1983).

In the first claim of the TAC, Plaintiff alleges a violation of procedural and substantive due process under the Fourteenth Amendment. (TAC, ¶¶ 104-29). The gist of Plaintiff's claim is that "[t]he City has intentionally deprived [Plaintiff's] constitutionally protected ownership and development rights in the Banning Point property by refusing to conduct a new, fair, and unbiased hearing on the Banning Point project or its motion for reconsideration." (Id., ¶ 112).

The Fourteenth Amendment provides, in pertinent part, that no State shall "deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV. "The touchstone of due process is protection of the individual against arbitrary action of government." Wolff v. McDonnell, 418 U.S. 539, 558 (1974). This Clause has both procedural and substantive components. See e.g., Dist. Attorney's Office for Third Judicial Dist. v. Osborne, 557 U.S. 52, 72 (2009).

A procedural due process claim has two elements: (1) A protected property or liberty interest, and (2) a denial of adequate procedural protections. Johnson v. Ryan, 55 F.4th 1167, 1179 (9th Cir. 2022); Pinnacle Armor, Inc. v. U.S., 648 F.3d 708, 716 (9th Cir. 2016) (citation omitted); see also Portman v. County of Santa Clara, 995 F.2d 898, 904 (9th Cir. 1993) ("A section 1983 claim based upon procedural due process thus has three elements: (1) [A] liberty or property interest protected by the Constitution; (2) a deprivation of interest by the government; (3) lack of process."); The Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 569 (1972) ("The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property.").

/ / /

The right to substantive due process "protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them.'" Collins v. City of Harker Heights, Tex., 503 U.S. 115, 125 (1992) (citation omitted). "To establish a substantive due process claim, a plaintiff must, as a threshold matter, show a government deprivation of life, liberty, or property." Nunez v. City of Los Angeles, 147 F.3d 867, 871 (9th Cir. 1998) (footnote and citation omitted). Such a claim also requires a plaintiff to show that the conduct at issue "shocks the conscience." County of Sacramento v. Lewis, 523 U.S. 833, 847 (1998); Gonzalez v. City of Anaheim, 747 F.3d 789, 797 (9th Cir. 2014); Porter v. Osborn, 546 F.3d 1131, 1137 (9th Cir. 2008).

"The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'" American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 59 (1999); see also Wedges/Ledges of California, Inc. v. City of Phoenix, Ariz., 24 F.3d 56, 62 (9th Cir. 1994) ("A threshold requirement to a substantive or procedural due process claim is the plaintiff's showing of a liberty or property interest protected by the Constitution.") (citations omitted). A property interest requires a person to "have more than an abstract need or desire for [a benefit]" and to "have more than a unilateral expectation of [a benefit]"; rather, a person must "have a legitimate claim of entitlement to [a benefit]." The Bd. of Regents, 408 U.S. at 577. "A protected property interest is present where an individual has a reasonable expectation of entitlement depriving from 'existing rules or understandings that stem from an independent source such as state law.'" Wedges/Ledges, 24 F.3d at 62 (citation omitted); Ass'n of Orange Cnty. Deputy Sheriffs v. Gates, 716 F.2d 733, 734 (1983); Parks v. Watson, 716 F.2d 646, 656 (9th Cir. 1983) ("A property interest in a benefit protected by the due process clause results from a 'legitimate claim of entitlement' created and defined by an independent source, such as a state or federal law.")

(citation omitted); see also Braswell v. Shoreline Fire Dept., 622 F.3d 1099, 1102 (9th Cir. 2010) ("State law creates a legitimate claim of entitlement giving rise to a protected property interest if it imposes significant limitations on the discretion of the decision maker.") (internal quotations omitted and cleaned up); Groten v. California, 251 F.3d 844, 850 (9th Cir. 2001) ("Whether a statute creates a property interest depends largely upon the extent to which the statute limits an agency's discretion in denying a license to an applicant who meets the minimum requirement."); Goodisman v. Lytle, 724 F.2d 818, 820 (9th Cir. 1984) ("A constitutionally protected interest has been created only if the procedural requirements are intended to be a 'significant substantive restriction' on the University's decision making. If the procedures required impose no significant limitation on the discretion of the decision maker, the expectation of a specific decision is not enhanced enough to establish a constitutionally protected interest in the procedures.") (citation and internal citations omitted).

*i. The City's Discretion over Design Review.*

As to Design Review, BMC section 17.56.050, cited by Defendants (Motion to Dismiss the TAC at 16), provides that:

> Prior to making a determination, the review authority shall determine that the project adequately meets adopted City performance standards and design guidelines, based upon the following findings: A. The proposed project is consistent with the General Plan.[;] B. The proposed project is consistent with the Zoning Ordinance, including the development standards and guidelines for the district in which it is located.[;] C. The design and layout of the proposed project will not unreasonably interfere with the use and enjoyment of neighboring existing or future development, and will not result in vehicular and/or

> pedestrian hazards.[;] D. The design of the proposed project is compatible with the character of the surrounding neighborhood.

(RJN No. 1, Exhibit 11).

Defendants argue that "Section 17.56.050 imbues a significant amount of discretion to the City—e.g., to determine whether a project is 'consistent' with the City's General Plan, to determine whether a project is 'consistent' with the City's Zoning Ordinance, and to determine whether a project design is 'compatible' with the surrounding neighborhood." (Motion to Dismiss the TAC at 16-17).

In response, Plaintiff makes several arguments regarding allegedly significant limitations on the City's discretion over a Design Review. (Opposition at 15-17).

First, Plaintiff argues that, based on language in Amendment 5, Section 2.1.1 which provides for allowable land use permitted within the Business and Warehouse District ("Table 1 (Allowable Land Uses) shows the allowable land use, activity, or facility permitted within the following Specified Plan Land Use District: [] Business & Warehouse District[;] [] Office & Professional District[;] [and] [] Retail & Service District[.]") and which provides that warehousing in the Business & Warehouse District is permitted "by right" and "without the need for discretionary approval" ("A Permitted Use . . . is permitted by right and may be established as the primary use of a building without the need for discretionary approval.") (Docket No. 82-1 at 13), the City's discretion over a project's Design Review is significantly limited. (Opposition at 15 ["Amendment No. 5's approval of certain permitted uses 'without the need for discretionary approval represents a significant limitation on the City's discretion and gave [Plaintiff] the reasonable expectation that the City would approve a project conforming to the permitted uses allowed 'by right' under Amendment No. 5."]). However, as Defendants assert (see Reply at 8), whether the land use was permitted, conditionally permitted, or prohibited (see Docket No. 82-1 at 13) is not relevant to whether a project satisfies the standards for a Design Review

under BMC section 17.56.050. See Friends of Davis v. City of Davis, 83 Cal.App.4th 1004, 1014 (2000) ("A city is not, pursuant to general law, required to have a design review ordinance. Accordingly, where, as here, a city chooses to impose such an additional level of review, it is for the city to determine the scope that such review will entail."); Wesley Investment Co. v. County of Alameda, 151 Cal.App.3d 672, 678 (1984) ("The fact that the site in question is in a zone where a retail store *may* be lawfully maintained does not diminish the county's power to determine that a particular development is not suitable for that location.") (citation omitted). Plaintiff implicitly admits such. (See Opposition at 15 ["Thus, the permitted *use* of the property has already been determined. What remained was approval of the project's *design*."]; italics in original). While Plaintiff makes the conclusory statement that Plaintiff's project complied with the design elements set forth in Amendment No. 5 (Opposition at 15-16), Plaintiff has not cited any authority holding that a municipality's discretion on design review is affected by its determination about the permitted use of a property.

Second, Plaintiff argues that under BMC section 17.56.050, which, as noted above, requires the City to "determine that the project adequately meets adopted City performance standards and design guidelines" based on four specified findings (consistency with the General Plan; consistency with the Zoning Ordinance; no unreasonable interference with the use and enjoyment of neighboring existing or future development; and compatibility with the character of the surrounding neighborhood), the City's review of Design Review applications is "limited to specific, objective criteria" which "serve as a significant limitation on the City's decision-making authority." (Opposition at 16).

As an initial matter, it is not clear to the Court that, and Plaintiff has failed to cite any authority supporting its assertion that, the four criteria are "objective." Moreover, the use of "consistent," "unreasonable interference," and "compatibility"

suggest that the City's discretion over a Design Review has not been significantly limited. See Shanks v. Dressel, 540 F.3d 1082, 1091 (9th Cir. 2008) ("We have not been directed to any statutory language that 'impose[s] particularized standards . . . that significantly constrain' Spokane's discretion to issue the permits in question and would create a protected property interest in the permits' denial."); Fidelity Financial Corp. v. Federal Home Loan Bank of San Francisco, 792 F.2d 1432, 1436 (9th Cir. 1986) ("Where the decision to confer a benefit is unconstrained by 'particularized standards or criteria,' no entitlement exists.") (citation and internal quotation marks omitted); see also Foss v. National Marine Fisheries Service, 161 F.3d 584, 588 (9th Cir. 1998) (finding that "carefully circumscribed requirements" in regulations and "specific, mandatory regulations" sufficiently constrained discretion for there to be a protectible property interest in a permit).

Third, Plaintiff argues that the City's discretion over Design Review is limited because "Amendment No. 5 already made findings that conforming projects would satisfy" the four criteria of BMC section 17.56.050. (Opposition at 16-17). As Plaintiff notes (see id. at 17), Amendment No. 5 expressly found that a compliant project would be consistent with the General Plan. (Docket No. 82 at 37-39 ["As evidenced by this consistency analysis, Sun Lakes Village North Specific Amendment 5 is consistent with the City of Banning General Plan."]). However, Plaintiff assumes that that its project is compliant with Amendment No. 5, which is an assumption the Court has no basis to accept. Consequently, the Court is unable to find that the City lacked discretion regarding the first criteria, namely, that "[t]he proposed project is consistent with the General Plan."[18] Moreover, although

[18] Plaintiff next relies on the fact that "Amendment No. 5 provided that it would trump the City's Zoning Ordinance." (Opposition at 17, citing Docket No. 82 at 34 ("Where conflict exists between the standards of the Specific Plan and those in the City of Banning Zoning Code (Banning Zoning Code), the standards contained in the Specific Plan shall apply.")). Since Defendants did

Plaintiff argues that Amendment No. 5 "determined a project conforming to its permitted uses and design standards would not 'unreasonably interfere with use and enjoyment of neighboring existing or future development' and would be 'compatible' with its surroundings" (the third and fourth criteria) (Opposition at 17, citing Docket No. 82 at 38-39 ("The Specific Plan's Development Standards and Design Guidelines employ building setbacks and screening/buffering requirements to limit impacts on adjacent and nearby residential uses.")), Plaintiff again is making the assumption that its project is compliant with Amendment No. 5. In any event, as Defendant asserts (see Reply at 8), the cited portion of Amendment No. 5 does not contain particularized standards or criteria, and does not address certain aspects of the third and fourth criteria, specifically, the impact on the enjoyment and use of neighboring existing development not caused by building setbacks or screening/buffering requirements, the impact of building setbacks and screening/buffering requirements on the enjoyment and use of future development, the impact of building setbacks and screening/buffering requirements on vehicles and/or pedestrians, and whether the design of the proposed project is compatible with the character of the surrounding neighborhood.

Plaintiff has failed to allege sufficient facts to establish a significant limitation on the City's discretion over Design Review such that Plaintiff would have a protectible property interest.

/ / /

/ / /

/ / /

---

not address this argument, the Court assumes, for purposes of its analysis, that the Banning Point Project would satisfy the second criteria, namely, that "[t]he proposed project is consistent with the Zoning Ordinance, including the development standards and guidelines for the district in which it is located."

*ii.* *The City's Discretion over a Tentative Parcel Map.*

As to a Tentative Parcel Map, Defendants (as they did in their Motion to Dismiss the SAP) cite to two California Government Code sections, specifically, California Government Code Sections 66473.5 and 66474. (Motion to Dismiss the TAC at 18).

Cal. Govt. Code § 66473.5 provides that:

> No local agency shall approve a tentative map, or a parcel map for which a tentative map was not required, unless the legislative body finds that the proposed subdivision, together with the provisions for its design and improvement, is consistent with the general plan required by Article 5 (commencing with Section 65300) of Chapter 3 of Division 1, or any specific plan adopted pursuant to Article 8 (commencing with Section 65450) of Chapter 3 of Division 1. [¶] A proposed subdivision shall be consistent with a general plan or a specific plan only if the local agency has officially adopted such a plan and the proposed subdivision or land use is compatible with the objectives, policies, general land uses, and programs specified in such a plan.

Cal. Govt. Code § 66474 provides, in pertinent part, that:

> A legislative body of a city or county shall deny approval of a tentative map, or a parcel map for which a tentative map was not required, if it makes any of the following findings: (a) That the proposed map is not consistent with applicable general and specific plans as specified in Section 65451.[;] (b) That the design or improvement of the proposed subdivision is not consistent with applicable general and specific plans.[;] (c) That the site is not physically suitable for the type of development.[;] (d) That the site is

> not physically suitable for the proposed density of development.[;] (e) That the design of the subdivision or the proposed improvements are likely to cause substantial environmental damage or substantially and avoidably injure fish or wildlife or their habitat.[;] (f) That the design of the subdivision or type of improvements is likely to cause serious public health problems.[;] (g) That the design of the subdivision or the type of improvements will conflict with easements, acquired by the public at large, for access through or use of, property within the proposed subdivision.

As Defendants assert (see Reply at 10), California Government Code Sections 66473.5 and 66474 do not contain mandatory terms; rather, they appear to grant the City broad discretion to approve or deny a Tentative Parcel Map.

Rather than address those statutes, Plaintiff argues that, based on BMC section 16.14.050,[19] Plaintiff "reasonably expected that review of the tentative map would be limited by the technical requirements of Sections 66427.1, 66473.6, 66474, 66471.1 and 66575.6 of the California Government Code and Section 21100 of the California Public Resources Code." (Opposition at 18). However, Plaintiff has failed to describe the "technical requirements" of California Government Code Sections 66427.1, 66473.6, 66474, 66471.1 and 66575.6 and California Public Resources Code Section 21000, and Plaintiff has failed to explain how the "technical requirements" of those statutes constrained the City's review of a Tentative Parcel Map.

/ / /

[19] BMC section 16.140.050 provides that: "Any action taken by the city council shall be supported by the findings required by Sections 66427.1, 66473.5, 66474, 66474.1 and 66474.6 of the California Government Code and Section 21100 of the California Public Resources Code."

Plaintiff then argues that the City's discretion over a Tentative Parcel Map also was limited by BMC sections 20.040.080 and 17.48.020 and the Banning Manual of Procedural Guidelines section 7.1(d)-(e) concerning the requirement of a fair hearing. (Opposition at 18). However, Plaintiff has failed to explain how those provisions significantly limited the City's discretion over a Tentative Parcel Map.

Consequently, Plaintiff has failed to allege sufficient facts to establish a reasonable expectation of entitlement giving rise to a protected property interest.

*iii.* *The Superior Court Judgment.*

In the TAC, Plaintiff alleges that its reasonable expectation of entitlement was based on "the City Council's prior approval of the tentative parcel map and design review for the project" and on the Superior Court's upholding of the City Council's prior approval. (TAC, ¶¶ 116-17).

Defendants argue that the City Council's prior approval and the Superior Court Judgment do not support a reasonable expectation of entitlement. (Motion to Dismiss the TAC at 19-20).

In response, Plaintiff argues that that the Superior Court Judgment gave Plaintiff a reasonable expectation of entitlement. (Opposition at 19 ["But the Superior Court's detailed blessing of the City's process for approving the project contributed to the reasonableness of [Plaintiff's] expectation that it would do so again. After all, the ruling explicitly found that substantial evidence supported the City's approval of the project."]; citing RJN No. 1, Exhibit 9).[20]

Plaintiff (again) has not provided any basis or authority, including in the Superior Court's March 14, 2024 findings and April 9, 2024 Judgment (see RJN No. 1, Exhibit 9), that limited the City's discretion in its reconsideration of the project. The TAC does not adequately allege a reasonable expectation of entitlement based

---

[20] Since Plaintiff does not argue that the City Council's prior approval gave Plaintiff a reasonable expectation of entitlement, the Court will not address that issue.

on a statute's limit of the City's discretion to deny a Design Review application and Temporary Parcel Map.

In sum, the allegations in the TAC are insufficient to state a plausible claim for procedural and substantive due process. See Breneric Associates v. City of Del Mar, 69 Cal.App.4th 166, 183-84 (1998) ("Because no protected property interest exists when there is significant discretion accorded the agency by law, regardless of whether or to what degree that discretion is actually exercised, the complaint does not allege a protected property interest and therefore [the plaintiff] has not stated a section 1983 claim based on denial of substantive due process."). Accordingly, dismissal of Plaintiff's claim for procedural and substantive due process is warranted.

b. Retaliation (42 U.S.C. § 1983).

The TAC alleges a claim of retaliation against the City and Flynn (in her individual capacity). (TAC, ¶¶ 130-39). Plaintiff claims that it "exercised its clearly established constitutional right under the First Amendment to advocate for its project and to participate in defending against PAG's litigation in state court." (Id., ¶ 133). Plaintiff further claims that "[i]n retaliation for [Plaintiff's] participation in the PAG litigation and advocacy for its project, Flynn, after driving Councilmember Hamlin out of town and enthroning herself on the City Council in Hamlin's place, wielded the power of the City to retaliate against [Plaintiff], denying [Plaintiff's] previously approved project on September 10, 2024, and denying [Plaintiff's] request for reconsideration on October 8, 2024." (Id., ¶ 134). Plaintiff further claims that: "[Plaintiff's] participation in the PAG litigation and its advocacy for the project were a substantial and motivating factor in the City and Flynn's conduct. In view of the City Council's originally having approved the project, and City staff's recommendations to reapprove the project, there is no doubt that the City Council would have against approved the project but for Flynn's bias and cajoling the City

Council to follow her will." (Id.). Plaintiff further claims that "Flynn's attempt to work around her failure to challenge the amendment to the specific plan by later tainting the project's Design Review further evidences retaliatory intent to punish [Plaintiff] for participating in the process of amending the specific plan and for daring to submit for Design Review a project compliant with that plan." (Id., ¶ 135).

An action taken in retaliation for the exercise of a First Amendment right is actionable under Section 1983. See Brodheim v. Cry, 584 F.3d 1262, 1269 (9th Cir. 2009); Hines v. Gomez, 108 F.3d 265, 267 (9th Cir. 1997). This includes the right to petition the government for redress of grievances. See Soranno's Gasco, Inc. v. Morgan, 874 F.2d 1310, 1314 (9th Cir. 1989). "To state a First Amendment retaliation claim, a plaintiff must plausibly allege that (1) [it] was engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity and (3) the protected activity was a substantial or motivating factor in the defendant's conduct." Capp v. County of San Diego, 940 F.3d 1046, 1053 (9th Cir. 2019) (citation and internal quotation marks omitted); see also Marez v. Bassett, 595 F.3d 1068, 1074 (9th Cir. 2010) (in order to establish a Section 1983 retaliation claim, a plaintiff must show: "(1) [it] engaged in expressive conduct that addressed a matter of public concern, the governmental officials took an adverse action against [it]; and (3) [its] expressive conduct was a substantial or motivating factor for the adverse action.") (citation and internal quotation marks omitted).

Plaintiff has failed to sufficiently allege the second and third elements of a First Amendment retaliation claim. As an initial matter, as Defendants assert (see Motion to Dismiss the TAC), there are limited allegations about retaliatory actions taken by the City. (See TAC, ¶ 19 ["Indeed, Councilmember Flynn's influence and personal animus caused the City, through Councilmember Flynn and other city officials doing her bidding, to retaliate directly against [Plaintiff] for having

advocated for its project, opposed PAG's litigation, and fought against the *de facto* taking of its property. Flynn and the City's retaliation included the denial of design review for [Plaintiff's] project (and later refusal to reconsider that denial) despite the project conforming with the specific plan that the Council had earlier amended to facilitate [Plaintiff's] project[.]"]).

Plaintiff asserts that it alleges that Defendants' retaliatory conduct of denying Design Review (and later denying reconsideration) "would chill a person of ordinary fitness from continuing to engage in protected free speech activity." (Opposition at 20, citing TAC, ¶¶ 19, 137). According to Plaintiff, such retaliatory conduct "sends the message that others with business before the City could see their requests denied if they advocate in ways Councilmembers, such as Flynn dislike." (Id.). Plaintiff asserts that the retaliatory denial of Design Review was "all the more chilling in light of Flynn's history of silencing her critics, including by suppressing residents' dissenting views on social media and by punishing other Councilmembers who disagree with her. (Id., citing TAC, ¶¶ 73-75).

While it is a close call, Plaintiff has not plausibly alleged that Defendants' retaliatory actions of denying Design Review (and later denying reconsideration) would chill a person of ordinary firmness from continuing to engage in the protected activities of advocating for a project and defending against PAG's lawsuit. Initially, it appears that Plaintiff has overstated its involvement in PAG's lawsuit. Since PAG's lawsuit was against the City and challenged actions by the City (TAC, ¶¶ 17, 55) and the Riverside Superior Court's findings and Judgment concerned actions by the City (RJN No. 1, Exhibit 9), it does not appear that Plaintiff had to defend itself in that lawsuit. Regardless, as Defendants assert (see Motion to Dismiss the TAC at 21; Reply at 11-12), in light of the nature of the process, it is not plausible that the denials of Design Review and later reconsideration would chill a person of ordinary fitness from continuing to advocate for a project or participate in PAG's lawsuit

against the City. While the issue is not whether the alleged retaliation actually chilled Plaintiff, Capp v. County of San Diego, 940 F.3d 1046, 1054 (9th Cir. 2019), the Court notes that on September 26, 2024 (the day after Plaintiff requested reconsideration), Plaintiff submitted an application for a mixed use project of warehouse space and commercial space at NEC Sun Lakes Boulevard and Sun Lakes Village Drive. (Docket No. 88-1 at 5-11). Plaintiff has not cited any authority holding that the type of retaliatory actions alleged to be taken by Defendants would chill a person of ordinary firmness from continuing to engage in the protected activities of advocating for a project and defending against a lawsuit.

Finally, Plaintiff asserts that it "has alleged that [Plaintiff's] participation in the PAG litigation and its advocacy for the project were a substantial or motivating factor in the City and Flynn's denial of the project." (Opposition at 22, citing TAC, ¶ 134). As noted above, Plaintiff has not clearly alleged the extent of its participation in the PAG litigation. Moreover, since, as Defendants point out (see Motion to Dismiss the TAC at 22-23; Reply at 12-13), the TAC contains allegations that Flynn was against Plaintiff's project from the time of Plaintiff's 2021 purchase of the land (see TAC, ¶¶ 48-51, 55, 121), far before the City's September 10, 2024 denial of the project and the City's October 8, 2024 denial of the request for reconsideration, it is questionable whether Plaintiff's participation in the PAG litigation and advocacy for the project were a substantial or motivating factor in Defendants' denial of the project. On this record, the Court is unable to find that the TAC sufficiently alleges that the protected activities were a substantial or motivating factor in the Defendants' conduct.

Since the TAC does not state a plausible claim of retaliation against the City and Flynn, Plaintiff's retaliation claim is subject to dismissal.

/ / /

/ / /

c. De Facto Taking (42 U.S.C. § 1983).

The TAC alleges that the City engaged in a de facto taking of Plaintiff's property. (TAC, ¶¶ 140-49). According to Plaintiff: "Over the course of decades, . . . , the City–first under the outsize influence of the Sun Lakes community when the City's elections were at large and now under the control of Flynn and her PAG/Sun Lakes community contingency–has undertaken a scheme to prevent development of the Banning Point project and unconstitutionally, inversely condemn/de facto take and preserve it in perpetuity in an undeveloped state, banking it for a future use as an amenity to the City and the Sun Lakes community, without the City's paying just compensation[.]" (Id., ¶ 141). Plaintiff specifically relies on the following actions by the City as support for its claim: (1) "[T]he City, under the Sun Lakes community's outsized influence, has prevented any development of the Banning Point project, including by rejecting every project [Plaintiff] or its affiliates have proposed, including projects for which the property was specifically zoned. Only when the Sun Lakes community briefly lost its grip over the City via the adoption of by-district elections did the City approve the project."; and (2) "[T]he City, at Flynn's and PAG, the Sun Lake community's urging, reneged on [Plaintiff's] previously approved project, refusing to re-approve a project that it previously had approved and that the Superior Court in the *Pass Action Group* litigation found had been appropriately reviewed, and then denied reconsideration of the denial on October 8, 2024." (Id., ¶ 145). Plaintiff claims that such actions, as well as "the fact that the City will not permit the site to be developed even for the purpose for which the City designated it demonstrates that the City simply will never allow an economically viable use of [Plaintiff's] property, as it desires instead to bank the property for the Sun Lake community's future use." (Id., ¶ 146). Plaintiff further claims that the City's actions have "wrongfully deprived [Plaintiff] of any reasonably economically viable use for the Banning Point property," and "have

rendered the property unmarketable, and otherwise damaged the Banning Point property and [Plaintiff]." (Id., ¶ 147).[21]

A public entity's action that directly and substantially interferes with property rights and thereby significantly impairs the value of the property constitutes a taking under the Fifth Amendment. Richmond Elks Hall Ass'n v. Richmond Redevelopment Agency, 561 F.2d 1327, 1330 (9th Cir. 1977). A de facto taking requires a showing that the government's actions deprived the plaintiff of "all economically viable use of the land." U.S. v. 99.66 Acres of Land, 970 F.2d 651, 657 (9th Cir. 1992). Under California law, a de facto taking occurs when a public entity engages in the "physical invasion or direct legal restraint" of private property. Klopping v. City of Whittier, 8 Cal.3d 39, 46 (1972); Jefferson St. Ventures, LLC v. City of Indio, 236 Cal.App.4th 1175, 1198 (2015).

Plaintiff asserts that that "[d]e facto takings can be described as 'banking' cases in which an agency blocks development, 'banking' land for future acquisition." (Opposition at 22). Although Plaintiff asserts that it "alleges that the City, at the behest of Sun Lakes, has blocked development of the Property for decades, banking the Property for the City and the Sun Lakes' community's future use" (id., citing TAC, ¶¶ 34, 141), Plaintiff has failed to allege that the City took official action to acquire private property or officially expressed an intent to acquire private property. See Taper v. City of Long Beach, 129 Cal.App.3d 590, 612-13 (1982); Trust of Three v. City of Emeryville, 430 F. Supp. 833, 841 (N.D. Cal. Jan. 12, 1977) ("Likewise, the suggestion to increase residential uses within the City without affirmative steps by the City to realize this goal through public acquisition

---

[21] Because Plaintiff again insists that it is alleging a de facto taking claim, and not a regulatory taking claim (Opposition at 24-25), the Court will examine whether Plaintiff has stated a plausible de facto taking claim (as opposed to a plausible regulatory taking claim). As a result, the Court will not address Defendants' arguments regarding the ripeness of Plaintiff's de facto takings claim under state and federal law (see Motion to Dismiss the TAC at 26-30; Reply at 15-17).

of private property does not indicate an illegal taking."). Plaintiff's assertions that "the City has taken official action by denying Design Review and refusing to reconsider that denial" and that "Flynn has made known her, and by extension the City's, intent to keep the property undeveloped in perpetuity for the benefit of Sun Lakes" (Opposition at 23) — allegations not contained in the TAC — are insufficient. Moreover, Plaintiff has failed to allege facts that would show that the City's actions deprived Plaintiff of all economically viable use of the land or rendered the land unsellable.

The allegations in the TAC are insufficient to state a plausible claim for a de facto taking. Accordingly, dismissal of Plaintiff's claim for a de facto taking is warranted.

d. Declaratory Relief.

The TAC alleges a claim for declaratory relief against the City. (TAC, ¶¶ 150-51; see Opposition at 27).

The Declaratory Judgment Act states, in pertinent part, that: "In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). A litigant seeking relief under the Declaratory Judgment Act must show there is a real and substantial controversy remediable by specific relief. See Aetna Life Ins. Co. of Hartford, Conn. v. Haworth, 300 U.S. 227, 240-41 (1937); see also Md. Cas. Co. v. Pac. Coal & Oil Co., 312 U.S. 270, 273 (1941) ("Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.") (citation omitted).

Plaintiff's claim for declaratory relief is deficient. Plaintiff cannot obtain declaratory relief when it has failed to allege any other plausible claim for relief.

Since Plaintiff has failed to allege a plausible claim for declaratory relief, Plaintiff's claim for declaratory relief is subject to dismissal.

3. Leave to Amend the TAC is Granted

At this stage of the litigation, the Court is unable to determine whether Plaintiff can state plausible claims against Defendants and therefore, the Court cannot conclude that amendment of Plaintiff's claims would be futile. Therefore, in the interests of justice, Plaintiff is granted another opportunity to cure the above-noted deficiencies in its pleading with respect to its claims.

## V.

## ORDER

IT IS THEREFORE ORDERED that: (1) Defendants' Motion to Dismiss the TAC is GRANTED; (2) Plaintiff's claims in the TAC are DISMISSED without prejudice and with leave to amend; and (3) if Plaintiff still wishes to pursue this action against Defendants, Plaintiff must file a Fourth Amended Complaint within thirty (30) days of this Order.

A Fourth Amended Complaint should bear the case number assigned in this case, be labeled "Fourth Amended Complaint," and be complete in and of itself without reference to any other pleading, attachment, or document.

DATED: October 19, 2026

DAVID T. BRISTOW
UNITED STATES MAGISTRATE JUDGE