ALLEN MATKINS LECK GAMBLE
MALLORY & NATSIS LLP
K. ERIK FRIESS (BAR NO. 149721)
ANDREW A. WOOD (BAR NO. 279403)
CATRIONA M. LAVERY (BAR NO. 310546)
LUCAS A. URGOITI (BAR NO. 333452)
2010 Main Street, 8th Floor
Irvine, California 92614-7214
Phone: (949) 553-1313
Fax: (949) 553-8354
Email: rfriess@allenmatkins.com
awood@allenmatkins.com
clavery@allenmatkins.com
lurgoiti@allenmatkins.com

Attorneys for Plaintiff
SUN LAKES HIGHLAND, LLC

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUN LAKES HIGHLAND, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF BANNING, a municipal corporation; SHERI FLYNN, an individual; and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No. 5:24-cv-02603-DTB<br><br>**FOURTH AMENDED COMPLAINT FOR:**<br><br>**(1) VIOLATIONS OF THE CIVIL RIGHTS ACT, 42 U.S.C. SECTION 1983 (DENIAL OF PROCEDURAL AND SUBSTANTIVE DUE PROCESS UNDER THE FOURTEENTH AMENDMENT);**<br><br>**(2) VIOLATIONS OF THE CIVIL RIGHTS ACT, 42 U.S.C. SECTION 1983 (RETALIATION);**<br><br>**(3) VIOLATIONS OF THE CIVIL RIGHTS ACT, 42 U.S.C. SECTION 1983 (DE FACTO TAKING); AND**<br><br>**(4) DECLARATORY RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

Page


INTRODUCTION ..... 5

THE PARTIES ..... 14

JURISDICTION AND VENUE ..... 15

GENERAL ALLEGATIONS ..... 15

A. Since the early 1980s, the City's staff has tried to promote development on the Banning Point Property. But the Sun Lakes community has thwarted those efforts, and the City has banked the property for the City's and Sun Lakes's own future use. ..... 15

B. For years and years, the City's electoral system granted residents of the Sun Lakes community overwhelming political power, which it used to cause the City to thwart development of the Banning Point property, banking the property for the City and the Sun Lakes community's future use. ..... 17

C. By 2020, with an overhaul to the City's electoral system, the City could finally embrace a new era of development, which included the Banning Point property. ..... 18

D. The City's process for project approval. ..... 23

E. In early 2021, SLH delivered on the City's new Specific Plan's vision for development of the Banning Point property. ..... 26

F. In early 2022, the City approved the entitlements required for SLH's Banning Point project, including design review, over PAG and Flynn's objections. ..... 29

G. In April 2022, on PAG's behalf, Flynn filed a petition for writ of mandate and a complaint for injunctive relief to challenge the City's approval of the project. ..... 34

H. In September 2022, following Flynn's months-long smear campaign, Councilmember Hamlin resigns – creating a seat on the City Council for Flynn. ..... 36

I. In March 2024, Flynn's scheme to destroy the Banning Point project hit a snag when the Riverside Superior Court ruled that the City Council's approval of the project complied with CEQA and was supported by substantial evidence. ..... 39

J. Just before the July 9, 2024 public hearing, Flynn coached PAG members to speak at the hearing and to submit comments in opposition to the project. ..... 41

Page

K. At the July 9, 2024 public hearing, Flynn used her position as councilmember to taint the vote and stop the City Council from reapproving the project ............ 44

L. Despite *five hours* of testimony and deliberation, Councilmembers Flynn, Happe, and Minjares could not identify or articulate facts to support the findings necessary for denial of the project. ............ 48

M. Soon after the July 9th public hearing, SLH discovered and called out Councilmember Flynn's bias based on her participation in the July 3rd PAG meeting and called out the inadequacy of the City's evidence in support of its findings for denial of the project. ............ 52

N. After depriving SLH of a fair public hearing on July 9 for the first time, the City Council denied SLH a fair public hearing twice more, on September 10 and October 8, 2024. ............ 54

O. In December 2024, Flynn strengthened her iron grip on political power with reelection as councilmember and appointment as the City's mayor. ............ 58

P. On June 8, 2026, the Riverside County Civil Grand Jury releases a report finding Banning in "a significant financial and administrative crisis that appear[s] to be the result of substantial mismanagement and lack of appropriate oversight." ............ 60

FIRST CAUSE OF ACTION Violations of the Civil Rights Act, 42 U.S.C. Section 1983 (Denial of Procedural and Substantive Due Process Under the Fourteenth Amendment)—Against the City of Banning and Does 1-10 ............ 61

A. SLH has a protected property interest in its ownership of the property and in the approval of its application. ............ 61

B. The City's review of SLH's applications was constitutionally inadequate  and unfair as it deprived SLH of a meaningful opportunity to be heard before an unbiased decisionmaker. ............ 76

SECOND CAUSE OF ACTION Violations of the Civil Rights Act, 42 U.S.C. Section 1983 (Retaliation)—Against The City of Banning, Sheri Flynn (Individually), and Does 1-10 ............ 79

THIRD CAUSE OF ACTION Violation of the Civil Rights Act, 42 U.S.C. Section 1983 (De Facto Taking)—Against The City of Banning and Does 1-10 ............ 82

FOURTH CAUSE OF ACTION (Declaratory Relief)—Against The City of Banning and Does 1-10 ............ 85

**Page**

PRAYER FOR RELIEF ........................................................................................87

Plaintiff Sun Lakes Highland, LLC ("SLH") submits this fourth amended complaint for (1) violations of the Civil Rights Act, 42 U.S.C. Section 1983 (Denial of procedural and substantive due process under the Fourteenth Amendment), (2) violations of the Civil Rights Act, 42 U.S.C. Section 1983 (Retaliation), (3) violations of the Civil Rights Act, 42 U.S.C. Section 1983 (*De Facto* Taking), and (4) declaratory relief against Defendant the City of Banning, a municipal corporation, Sheri Flynn, an individual, and Does 1 through 10, and alleges as follows:

## INTRODUCTION

1. In 2020, the City of Banning adopted an amendment to its governing "specific plan." This amendment is attached to this Complaint as **Exhibit A**. No one challenged the amendment. The City created the amendment to the specific plan with SLH in mind, anticipating that SLH soon would submit for approval a mixed-use project that the specific plan amendment was designed to facilitate and that would bring a significant boon to the economically depressed area.

2. The City was only able to adopt this unchallenged amendment because at that time it enjoyed a temporary reprieve from the Sun Lakes' Community's vise-like grip that for decades blocked any development on SLH's land.

3. This case is thus about the Sun Lakes community's successful crusade to impose its will on the rest of the City of Banning and reassert its grip after the City briefly acted against its wishes. For decades and decades, the Sun Lakes community—a small, well-off enclave within the larger, economically disadvantaged City—has used its outsized influence to thwart development of SLH's property, commonly known as the Banning Point property, resulting in the City's banking the land for the benefit of the City and the Sun Lakes community. The Banning Point property is located within the City, in a community on the outskirts of Sun Lakes. Its development, as City staff has recognized, would provide an economic boon to the struggling City outside Sun Lakes' walls.

4. The City's forced shift to district-based elections loosened Sun Lakes' grip on the City Council, allowing the City to implement the unchallenged amendment to the specific plan so as to facilitate SLH's project. After the City adopted the specific plan amendment—which no one challenged—SLH submitted for design review a project that fit within the specific plan amendment's parameters.

5. The scope of "design review" is limited, and the Banning Municipal Code gives the City's Planning Commission limited discretion to approve or deny design review. For example, Municipal Code section 17.04.070 defines "Design" as including "the planning and engineering of the following: street alignments, grades and widths; drainage and sanitary facilities and utilities, including alignment and grades thereof; location and size of all required easements and rights-of-way; fire roads and fire breaks; lot size and configuration; traffic access; grading; land to be dedicated for park or recreational purposes; building and other such specific physical requirements." "Design" does not include or contemplate the type of property being considered, whether residential, commercial, industrial/warehouse or otherwise.

6. As SLH's submission fit within the parameters of the specific plan amendment that had been developed to help facilitate the project, the Planning Commission approved design review.

7. When Sheri Flynn and the Sun Lakes community discovered this, they were furious and took action to reassert the Sun Lakes community's grip over the larger City. Despite their failure to timely challenge the specific plan amendment on which the design review approval was based, they, among other things, challenged the design review approvals (but notably not the amendment to the specific plan) by burdening Banning's taxpayers with the City's defense of an expensive and wasteful lawsuit brought by its manufactured entity Pass Action Group. And, through a recall effort, they drove a prior City Councilmember out of

town, and installed Flynn on the City Council and then even as Mayor.

8. When the Superior Court rejected virtually all of Sun Lakes'/PAG's challenge, affirming SLH's approvals as complying with CEQA, but sending them back for a re-vote in light of perceived bias by a former Councilmember, Flynn rallied PAG supporters to overwhelm the City Council with opposition and used her newfound authority as a City Councilmember to kill the project. She did not even try to hide her undeniable bias against SLH and its project. Indeed, Flynn had been publicly opposed the project since at least 2022 and described SLH as "a ruthless, build at all costs developer from Arizona." Instead, she treated her bias as a good thing and refused to recuse herself so that she could personally see to the project's denial. She even tried to claim that California's Political Fair Practices Commission had blessed her refusal to recuse herself given her bias (it did no such thing).

9. And when SLH requested reconsideration, including because of Flynn's undeniable bias—a request that City staff specifically found timely and appropriate—Flynn inserted herself into the City Council's deliberation on that issue, too, in order to ensure that the City rejected the request and to retaliate against SLH for exercising its First Amendment rights to participate in the approval process and in PAG's largely unsuccessful litigation. The City thus put an end to SLH's previously approved project by denying the request for reconsideration on October 8, 2024.

10. Flynn then got herself enthroned as Mayor (and with that position obtained *de jure* authority over many of the City's committees and agencies). Now firmly back in control of the City, the Sun Lakes community became free once again to impose its will on the larger Banning community, including by continuing to prevent the development of the SLH property, banking it for the City's and the Sun Lakes community's future use in perpetuity and depriving SLH of all economically viable use of the property.

11. As a result of Flynn's biased actions, there is no hope that the City will ever approve the SLH property to be used as anything other than a park or other amenity for the Sun Lakes community, and it is futile for SLH to continue trying to pursue any economically viable development of the property. Indeed, Flynn's stated position is that the property should be used for "a park, skating rink, [or] much needed restaurants and stores," as she has stated in public comments.

12. Fortunately, the United States Constitution provides a remedy for the City's willful failure to give SLH's project the due process it is owed, for the City's retaliation against SLH for exercising its First Amendment rights, and for the City's *de facto* taking of SLH's property without just compensation.

13. SLH's role in this saga formally began in April 2021, when SLH purchased roughly 47 acres of undeveloped, commercially zoned property, located within the Sun Lakes Village North Specific Plan area of the City of Banning, commonly known as the "Sun Lakes community." But SLH's affiliates had previously been working to develop the property for years and years. What SLH did not know was that the City, driven by the Sun Lakes community, and later led by Sheri Flynn, would do everything it could to prevent development of SLH's property. Indeed, though the City has for more than 40 years paid lip service to the concept of facilitating development of SLH's property to help boost the local economy with new jobs and infrastructure, it has rejected every single effort to develop the property—including efforts to develop the property for the purpose for which it is zoned. This has consistently been because the Sun Lakes community exercised its control of the City to prevent all development on that property to bank the property for the City's and the Sun Lakes community's future use.

14. In December 2020, the City paid further lip service to developing Banning Point, this time by adopting a fifth amendment to the Sun Lakes Village North Specific Plan to establish a route for development of the Banning Point property. The City developed and adopted the plan in consultation with SLH and

with the intention of SLH developing the property for the benefit of the broader Banning community. The plan established three different land use districts for the Banning Point property, each of which would contemplate and allow for a variety of permitted and conditionally permitted uses. In 2021, consistent with the plan's land use designations and development standards, SLH submitted plans to boost the local economy with new jobs and infrastructure with the development of the Banning Point project: a proposed 619,959-square-foot industrial warehouse with 10,000 square feet of associated office space and six commercial/retail buildings totaling approximately 34,000 square feet. SLH alleges on information and belief that the Banning Point project was all but guaranteed to rescue the City's struggling economy, which largely consists of economically disenfranchised residents, who live well below the regional median income level.

15. But some Banning residents within the City's Sun Lakes community, who for years and years have shown little regard for the broader community by isolating themselves behind the Sun Lakes community's high walls, gated barriers, and lush green golf courses (regional water shortages notwithstanding), had different plans for the Banning Point property. On information and belief, Sun Lakes wants the Banning Point property banked for its own and the City's use—*i.e.*, to remain undeveloped and ultimately to become a park or other amenity for their residents' enjoyment.

16. Among the self-interested Sun Lakes residents was Sheri Flynn (ultimately elected to City Council in December 2022) who helped form and lead the well-funded Pass Action Group organization, commonly known as "PAG," to bolster opposition against the Banning Point project, deny SLH its constitutionally protected property interests related to SLH's ownership and development rights in the Banning Point property, and ultimately to use the levers of City government to retaliate against SLH for exercising its First Amendment rights to participate in the approval process and in PAG's largely unsuccessful litigation. Sheri Flynn was a

member of the PAG Executive Board, signed letters and agreements, was the point person in fruitless settlement negotiations, signed pleading verifications on behalf of PAG, and was an outspoken advocate for PAG in proceedings related to the City's consideration and ultimate initial approval of the Banning Point project. PAG's sole and exclusive corporate purpose is and was to defeat the Banning Point project, disenfranchising the City's broader community by depriving residents of new jobs, increased tax revenue, and an overall boost to the City's economic development.

17. The City Council approved SLH's project in February 2022, giving SLH a legitimate claim and expectation of entitlement to move forward with developing its property. But Flynn coordinated and directed PAG to sue, challenging the City's approvals under the California Environmental Quality Act and State Planning and Zoning Law and asserting that three of the five City Councilmembers that voted on the project were biased in favor of the project thereby violating PAG's right to a fair hearing. Flynn's and PAG's goal was (and is) to quash all efforts at development and to prevent the Banning Point property from being developed. But the Superior Court ultimately rejected and denied all of Flynn's and PAG's claims challenging the project except for a single finding that Councilmember Mary Hamlin had demonstrated an unacceptable probability of a risk of bias. The Superior Court ordered that the City vacate and set aside the project approvals and directed that any future reconsideration of the project be conducted without the participation of Councilmember Hamlin.

18. SLH is informed and believes that during the pendency of the lawsuit, Flynn furthered a plan to turn the City Council upside down and position herself as a Councilmember with the requisite power to control and manipulate the City's development goals within the Sun Lakes Village North Specific Plan area. Flynn's plan also aimed to reverse the equal distribution of power that district-based elections in 2018 had provided to the broader community—which had resulted in

the City's approval of SLH's project. In less than a year, "resident Flynn" became "Councilmember Flynn," after she used PAG to file the aforementioned lawsuit against the City and City Council, waged a smear campaign for signatures to hold a special recall election against a sitting Councilmember (Councilmember Hamlin) to force her resignation, and then ran to fill that vacancy herself. Flynn did all of this with the goal of ensuring that the City would keep the Banning Point property undeveloped, banking the property for the City's and the Sun Lakes community's future use and enjoyment as a park or other amenity, and to continue to thwart all efforts to develop it for any economically viable use.

19. Once vested with her governmental authority, and after the Superior Court's rejection of all of Flynn's and PAG's claims against the project except for the bias claim involving Councilmember Hamlin, now-Councilmember Flynn engaged in a series of coordinated efforts with PAG to influence the City Council's reconsideration of entitlements for the Banning Point project and to use the power of the City to retaliate against SLH for having defended its project, including with respect to PAG's litigation, among other things. On information and belief, Councilmember Flynn's personal animus toward the project tainted the City Council's July 9, 2024, public hearing at which the City reconsidered the project, based on the Superior Court's order, and the subsequent hearing on September 10, 2024, that ultimately resulted in the adoption of Resolution 2024-151, wrongfully denying SLH the entitlements needed to proceed with development of the Banning Point project. As a result, Councilmember Flynn's influence compromised the City's obligations to fair and impartial governance, shirking its legal duty to serve all residents, members of the community, and project applicants with integrity and equity. Indeed, Councilmember Flynn's influence and personal animus caused the City, through Councilmember Flynn and other city officials doing her bidding, to retaliate directly against SLH for having advocated for its project, opposed PAG's litigation, and fought against the *de facto* taking of its property. Flynn and the

City's retaliation included the denial of design review for SLH's project (and later refusal to reconsider that denial) despite the project conforming with the specific plan that the Council had earlier amended to facilitate SLH's project—retaliatory conduct that would chill any person of ordinary firmness from continuing to engage in protected free speech activity.

20. To support her biased conduct, Flynn proudly waved aloft a 2023 letter from the California Fair Political Practices Commission, claiming that the letter said she did not need to recuse herself because of her bias. But the letter said no such thing. It simply said that the proximity of Flynn's residence to the project did not automatically require her recusal. The Commission took pains to note that it did not consider, and offered no opinion on, whether Flynn had to recuse herself based on any "common law conflict of interest." It stated: "we caution that our advice is limited to the provisions of the Act and Section 1090. The Fair Political Practices Commission cannot provide advice outside of these provisions. Accordingly, we express no opinion regarding the potential application of common law conflict of interest provisions."

21. Shortly after the City's September 10 denial of the project at Flynn's behest, SLH timely brought a request for reconsideration, which also served to further exhaust SLH's administrative remedies. The request for reconsideration, included, among other things, evidence of Flynn's bias and evidence that her bias had infected the Council's vote. City staff prepared a report finding the request timely. Flynn should have recused herself from the Council's determination of the reconsideration motion. Although the evidence of Flynn's bias far exceeded what Flynn/PAG had claimed showed former Councilmember Hamlin to be impermissibly biased, Flynn refused to recuse herself. She instead once again inserted herself into the process in order to ensure that the request for reconsideration would be denied and so that she and the City could retaliate against SLH for exercising its First Amendment rights. And on October 8, 2024, thanks to

Flynn's interference, the City did just that, putting a final end to SLH's project. SLH is informed and believes that had Flynn not personally seen to its denial, the request for reconsideration would have been granted.

22. After this final denial, in December 2024 Flynn got herself installed as mayor, giving herself control over all the levers of government necessary to make sure the City would never approve development on the Banning Point property and allowing her to continue to use the City's authority to retaliate against SLH.

23. As a result of all of this, the City has intentionally deprived SLH of its "constitutional guarantee" of due process, the City and Flynn have retaliated against SLH for exercising its First Amendment rights, and the City has *de facto* taken and banked SLH's property without just compensation. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985); *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989); *Jones v. People ex rel. Dep't of Transp.*, 22 Cal.3d 144, 149 (1978); *People ex rel. Dep't. of Transp. v. Diversified Properties Co. III*, 14 Cal.App.4th 429, 442-443 (1993). More specifically, the City has denied SLH its right to procedural and substantive due process to be heard before an unbiased decisionmaker, and thus deprived SLH of its constitutionally protected property interests related to SLH's ownership and previously approved development rights in the Banning Point property. The deprivation of SLH's constitutional rights also violates section 1983 of the Civil Rights Act. In addition, the City's findings in support of its September 10, 2024 Resolution 2024-151 are woefully inadequate, unsupported by substantial evidence, and insufficient to justify or sustain the denial of the Banning Point project. Again, the City's and Flynn's actions were taken in retaliation for SLH's having exercised its First Amendment rights and to ensure that the Banning Point property is never developed for any economically viable use, and is instead banked for future use as an amenity, like a park, for the City's and Sun Lakes residents' enjoyment. This complaint became necessary because the City and Flynn blatantly violated their constitutional and statutory obligations to SLH

and the Banning Point project.

24. By this complaint, SLH seeks damages and a judicial declaration regarding the City's intentional deprivation of SLH's due process rights.

**THE PARTIES**

25. Sun Lakes Highland, LLC, is a Delaware limited liability company and owns the property designated as Assessor's Parcel Number 419-140-057. That property is located in the Sun Lakes Village neighborhood of the City of Banning, California.

26. Defendant City of Banning is, and at all times mentioned in this complaint was, a public/municipal entity duly organized and existing under and by the laws of the State of California.

27. Defendant Sheri Flynn was, at the time SLH filed this action, an individual residing in Riverside County, California. On information and belief, Flynn is no longer a resident of Riverside County, California and now resides in Texas. After Flynn's election to the Banning City Council on December 13, 2022, she acted under the color of state law as a member of Banning's City Council and later as mayor of the City of Banning.

28. SLH is ignorant of the true names and capacities of the defendants sued herein as Does 1 through 10, inclusive, and therefore sues these defendants by such fictitious names. SLH will seek leave to amend this complaint to allege their true names and capacities when ascertained. SLH is informed and believes that each of such fictitiously named defendants is in some way responsible for the acts, injuries, and damages alleged in this complaint.

29. SLH is informed and believes that at all times mentioned in this complaint, defendants Does 1 through 10, inclusive, were the agents, servants, and employees of their co-defendants and, in doing the things mentioned in this complaint, were acting within the course and scope of their authority as such agents, servants, and employees with the permission and consent of their co-

defendants.

## JURISDICTION AND VENUE

30. This case arises under the United States Constitution and 42 U.S.C. sections 1983 and 1988. This Court has subject matter jurisdiction pursuant to 28 U.S.C. sections 1331, 1343, and 1367(a).

31. This Court is the appropriate venue for this case pursuant to 28 U.S.C. section 1391(b)(2). SLH's property is located in this judicial district, the actions complained of took place in this judicial district, documents and records relevant to the allegations are maintained in this judicial district, and the defendants conduct their affairs in this judicial district.

## GENERAL ALLEGATIONS

### A. Since the early 1980s, the City's staff has tried to promote development on the Banning Point Property. But the Sun Lakes community has thwarted those efforts, and the City has banked the property for the City's and Sun Lakes's own future use.

32. The Banning Point property is located within the Sun Lakes Village North Specific Plan, which was originally approved by the City on February 28, 1983. The majority of the roughly 963 acres making up the Specific Plan has been developed for decades, but the City, thanks to Sun Lakes' dominant influence, did not allow development on the 47 acres that comprised the Banning Point property. For years and years, the lack of development on the Banning Point property became an issue for the City. SLH is informed and believes that the Banning Point property became an attractive nuisance, resulting in illegal dumping on the property and transient activities that were not only an eyesore but further strained the already under-resourced City.

33. In 2006, the City paid lip service to resolving these problems, by amending the Specific Plan with the ostensible purpose of spurring development of the Banning Point property by designating it for auto dealership uses. Yet the

market did not support these uses, so the land persisted as an attractive nuisance for another *14 years*, despite efforts by the prior owners, including affiliates of members of SLH.

34. In 2011, an affiliate of a member of SLH, purchased the Banning Point property, setting the stage for what many hoped would be a transformative development in the City. Between 2012 and 2018, the affiliate pursued and marketed several potential uses of the Banning Point property besides warehouse use, including retail, entertainment, and automotive development.

35. On information and belief, since SLH's affiliate acquired the property in 2011, powerful anti-growth factions within the Sun Lakes community vehemently objected to all efforts to develop the property, and the City accordingly rejected them. On information and belief, Sun Lakes wants the Banning Point property preserved from development, thus banking it for the City's future use as an amenity for the City and the Sun Lakes community. As Flynn has stated, she wants the property developed into "a park, skating rink, [or] much needed restaurants and stores." On information and belief, so long as the Sun Lakes community continues to control the City, the City will never allow SLH's property to be developed as anything else, depriving SLH of all economically viable use of the property.

36. From 2012 to 2013, the affiliate marketed the property for mixed-use and as site for an auto dealership (just as the 2006 amendment to the Specific Plan permitted). The affiliate listed the property with Lee & Associates, a national commercial brokerage/real estate marketing firm, but received no interest or offers.

37. From 2014 to 2016, the affiliate marketed the property for retail uses. The affiliate listed the property with Neece Commercial. A retail developer pursued potentially developing the property with a theater and big box retailers, but the buyer dropped out after nearly two years of trying to put together a viable project.

38. From 2016 to 2017, the affiliate marketed the property for mixed-use and housing development. The affiliate listed the property with Daum Commercial.

The property was reviewed 67 times but no interest in the project materialized due to demand for areas with higher demographic support.

39. From 2018 to 2019, the affiliate marketed the property for mixed-use and retail with proposed uses including a theater, health club, restaurants, office, big box retailers, and residential. The affiliate listed the property with Lee & Associates again, but, as before, there was no interest.

40. On information and belief, Sun Lakes' opposition to development of the property was a driving force behind SLH's affiliate's inability to develop the property. In a PAG Newsletter dated February 3, 2022, the group bragged about Sun Lakes' prior successes in thwarting plans to develop the property, stating: "This is not the first time a major commercial development has been proposed for the vacant land across from Sun Lakes Country Club." The newsletter specifically mentions a "new car dealership" as a project that was "eventually cancelled due to the determined pushback from Sun Lakes Country Club residents."

**B. For years and years, the City's electoral system granted residents of the Sun Lakes community overwhelming political power, which it used to cause the City to thwart development of the Banning Point property, banking the property for the City and the Sun Lakes community's future use.**

41. SLH is informed and believes that the City's electoral system reflected the anti-growth sentiments the Sun Lakes community toward developing the Banning Point property and the Sun Lakes community's demand to prevent the property from being developed for any economically viable use. For years and years, Banning's at-large election system enabled the Sun Lakes residents to exert outsized influence over Citywide decisions, obstructing growth initiatives that could benefit the City's broader community. On information and belief, public complaints grew over this power imbalance, with many asserting that the Sun Lakes residents were deliberately blocking economic opportunities, especially for underrepresented, minority communities, all because the Sun Lakes community

wanted the City to reserve, or bank, the property for use as amenity, such as a park, for the benefit of the Sun Lakes community.

42. In or around 2016, the City's at-large election system raised serious questions about its potential violation of the California Voting Rights Act. The general public then demanded a shift to by-district elections. As a result, in or around 2018, the City transitioned to by-district elections, disrupting the Sun Lakes community's long-standing grip on power. And on information and belief, this change introduced fairer representation across the City, including for its diverse population.

43. The shift to by-district elections began to pry apart the Sun Lakes community's vise-like grip on the City. And in the brief moment that that grip was loosened, the City approved SLH's project. Yet rather than accepting the by-district election system and the equitable distribution of power, residents of the Sun Lakes community reasserted their political control through Flynn and PAG, in order to ensure that the City banked the Banning Point property for Sun Lakes's benefit and ensure that it would never be developed for any economically viable use.

**C. By 2020, with an overhaul to the City's electoral system, the City could finally embrace a new era of development, which included the Banning Point property.**

44. In 2020, temporarily out of the Sun Lakes community's grasp and control, the City went back to the drawing board, and, in consultation with SLH, amended (by unanimous vote) the Specific Plan for a fifth time, commonly referred to as Amendment No. 5, to "reflect current market conditions and real estate trends, creating viable land uses and development concepts for the Specific Plan area." (Ex. A, Amendment No. 5, § 1.1 – Purpose.) Amendment No. 5 sought to "delineate[] a new vision for development of the Specific Plan area," including allowing for "a range of land uses that reflects current market conditions given the trend away from brick-and-mortar retail" and to "[r]espond to an increase in e-

commerce," among other objectives. (Ex. A, Amendment No. 5, § 1.4 – Guiding Objectives.) Amendment No. 5 established three different land-use districts for the Banning Point property, each of which would contemplate and allow for a variety of permitted and conditionally permitted uses:

- **Business & Warehouse District**. The Business & Warehouse District use consists of approximately 30.22 acres and is located in the northwest portion of the Specific Plan area, adjacent to the Sun Lakes Village shopping center, the Southern Pacific railroad, and the I-10 freeway. The Specific Plan permits general warehousing by right within this district.
- **Office & Professional District**. The Office & Professional District is approximately 10.06 acres and is located between the Business & Warehouse District and the residential units to the east of the property that are part of the Sun Lakes Country Club community.
- **Retail & Service District**. The Retail & Service District is about 6.83 acres and is located between the Business & Warehouse District and the Sun Lakes Country Club residential units to the south. Amendment No. 5 allows for a wide range of uses varying from clothing stores, pet grooming, gyms, and restaurants.

45. Below is an aerial image depicting the City's three different land use districts for the undeveloped 47 acres under Amendment No. 5.




46. In each of these districts, the designated use (business & warehouse, office & professional, or retail & service) was "permitted by right and may be established as the primary use of a building without the need for discretionary approval. (Ex. A, Amendment No. 5, § 2.1.1, p. 9—Allowable Land Uses).

47. Amendment No. 5 also listed Development Standards for any development of the property, such as landscaping, parking, and building height requirements, as well as design elements contemplating even the color of building materials, shade and irrigation, and golf cart parking. (Ex. A, Amendment No. 5, § 3.)

48. In December 2020, the City adopted Amendment No. 5 to the Sun Lakes Village North Specific Plan after determining, among other things, that the land uses SLH contemplated for the Banning Point property would not be detrimental to public interests and would ensure development of a desirable character, compatible with the surrounding neighborhood. Specifically, Amendment No. 5 included an analysis of whether the amendment was consistent with the City's general plan. That analysis, which the City adopted and which was

not challenged, concluded that Amendment No. 5 "*is consistent with the City of Banning General Plan*." (*Id.* at p. A-1 [emphasis added].)

49. Amendment No. 5's consistency analysis included the following findings regarding adjacent neighborhoods:

> *The provisions of the Specific Plan*, including the development standards, streetscape plan, and phasing requirements, *serve to protect the existing residential neighborhoods in the vicinity of the Specific Plan area*.
>
> The northeast boundary of the Specific Plan area abuts existing small lot residential units that are part of the Sun Lakes Country Club active adult/golf course community. The Specific Plan's Development Standards require a 50-foot building setback along the northeast perimeter to buffer the existing residences from development within the adjacent Office & Professional District. Additionally, a 20-foot wide landscape setback is required along the northeast boundary to provide screening for the existing residences. The landscape setback must include evergreen screen trees of a species and size that will result in a solid tree screen above the existing wall within one year.
>
> The Specific Plan area is also located directly across Sun Lakes Boulevard from the Sun Lakes Country Club main entrance. The Streetscape Plan Development Criteria require existing mature trees within the median and along the street to be preserved whenever feasible. New landscaping will also enhance entry drives into the Specific Plan area and along the street frontage. The

> Design Guidelines require that parking lots within the Retail Service District that front onto Sun Lakes Boulevard be screened with berms or landscaping three-feet high to protect viewsheds from the Sun Lakes Country Club community. The phasing requirements promote development within the Retail & Service District, which will be smaller scale, by requiring entitlement of the Retail & Service District prior to occupancy of the Business & Warehouse District . Thus, the smaller commercial buildings will help screen the Business & Warehouse District's larger buildings as seen from Sun Lakes Boulevard. Buildings that remain visible must demonstrate high quality architectural design and detail. Loading docks, dock doors, and semi-truck parking areas are not allowed to be visible from the street frontage.
>
> (Ex. A, Amendment No. 5, App'x at pp. A-1 to A-2 [emphasis added].)

50. Amendment No. 5's consistency analysis included the following findings regarding industrial goals and compatibility with adjacent lands:

> The Specific Plan provides for a wide range of light industrial and commercial uses in its three districts: Business & Warehouse District, Office & Professional District, and Retail & Service District. *The development standards and design guidelines included in the Specific Plan promote high quality development that limits impacts on the nearby uses.*
>
> ….

> The Specific Plan land uses will increase availability of goods and services for nearby residents, expand job opportunities within the area, and boost sales tax and other revenue sources for the City.
>
> The Specific Plan's Development Standards and Design Guidelines employ building setbacks and screening/buffering requirements to limit impacts on adjacent and nearby residential uses. The Design Guidelines also ensure that new development is of high quality through provisions that address architectural design, site design, and landscaping.
>
> ….
>
> (Ex. A, Amendment No. 5, App'x at p. A-3 [emphasis added].)

**D. The City's process for project approval.**

51. Under normal circumstances, absent biased and retaliatory conduct from City officials like Councilmember Flynn, the Banning Municipal Code and City Council Manual provide substantive limits on the discretion of City officials to deny or approve project applications.

52. As part of Design Review, the Planning Commission reviews project proposals for compliance with the specific Design Review criteria listed in Banning Municipal Code section 17.56.050, which states:

> Prior to making a determination, the review authority shall determine that the project adequately meets adopted City performance standards and design guidelines, based upon the following findings:
>
> A. The proposed project is consistent with the General Plan.

B. The proposed project is consistent with the Zoning Ordinance, including the development standards and guidelines for the district in which it is located.

C. The design and layout of the proposed project will not unreasonably interfere with the use and enjoyment of neighboring existing or future development, and will not result in vehicular and/or pedestrian hazards.

D. The design of the proposed project is compatible with the character of the surrounding neighborhood.

53. The Banning Municipal Code further explains that "Design includes the planning and engineering of the following: street alignments, grades and widths; drainage and sanitary facilities and utilities, including alignment and grades thereof; location and size of all required easements and rights-of-way; fire roads and fire breaks; lot size and configuration; traffic access; grading; land to be dedicated for park or recreational purposes; building and other such specific physical requirements." (Banning Municipal Code § 17.04.070 – Definitions.)

54. As such, Design Review is limited to specific criteria that provide the Planning Commission and City with very limited discretion. Design Review does not permit the Planning Commission or the City Council to reconsider whether to allow industrial or warehouse use on SLH's property: that is already allowed, "by right" and "without the need for discretionary approval," by the specific plan amendment. (Ex. A, Amendment No. 5, § 2.1.1, p. 9—Allowable Land Uses; *see id.* § 2.1.2, Table 1, p. 12 [referencing warehousing uses permitted by right].)

55. Indeed, to this day Councilmember Flynn acknowledges SLH's property is appropriately zoned for the project. In July 2025, while complaining that this Court had, in her words, put her then-pending Motion to Dismiss "on the back burner," Flynn commented on Facebook: "Banning Point property across from gate 1 in Sun Lakes was zoned Commercial /Retail until it was changed to allow

industrial warehouses in December 2020. It was never zoned for residential."

56. The Banning Municipal Code section 16.14.050 provides substantive requirements for the approval of tentative parcel maps, stating:

> A. At the next regular meeting of the city council following the filing of the planning commission's report, the city council shall fix the meeting date at which the tentative map will be considered by it, which date shall be within thirty days thereafter. After a public hearing, the city council shall approve, conditionally approve, or disapprove the tentative map within that thirty-day period.
>
> B. Upon conclusion of the hearing, the city council shall, within ten days, declare its findings. Any action taken by the city council shall be supported by the findings required by Sections 66427.1, 66473.5, 66474, 66474.1 and 66474.6 of the California Government Code and Section 21100 of the California Public Resources Code.

57. The Banning Municipal Code sections governing design review and tentative parcel maps are couched in mandatory and limiting terms, significantly restricting the City's decision making, as they require the City to consider only the specific factors listed in determining whether to approve or deny the respective design review and tentative parcel map applications.

58. The Banning Municipal Code also requires that applicants receive a fair hearing. Banning Municipal Code section 17.48.020, governing filing procedures for, among other things, permits, states: "Requests for permits and other regulatory determinations must be processed fairly, and evenhandedly, and in a way that puts all applicants on an equal footing with one another. Steps in the

application process should be clearly laid out, and adhered to by staff as well as by the applicant, so that due process is provided. Both applicants and the public need to have a level of comfort in the process, and a level of confidence that reasonable and predictable outcomes will be achieved."

59. The City Council's "Manual of Procedural Guidelines for the Conduct of City Council and Constituent Body/Commission Meetings for the City of Banning" further secures an applicant's right to a fair hearing. (*See* Banning Municipal Code § 2.04.080 [stating that the Manual "shall govern the conduct and procedures applicable to meetings of the city council and related city bodies, boards and commissions"]).

60. The City Council Manual states: "For quasi adjudicative matters involving public hearings, the members of the Legislative Body shall not prejudice the matter prior to the public hearing, shall be fair and impartial, and shall decide the matter based upon the evidence and the statutorily required findings ... For such matters, Legislative Body members *should avoid expressing an opinion or divulging their thought process until after the public hearing has been completed*." City Council Manual § 7.1(d), (e) (emphasis added).

61. In sum, the City's Municipal Code and City Council Manual (when followed) provide for a fair and predictable process and limit the discretion of City officials in approving or denying project applications.

**E. In early 2021, SLH delivered on the City's new Specific Plan's vision for development of the Banning Point property.**

62. In early 2021, SLH submitted an application to the City to develop the Banning Point property. SLH's Banning Point project proposed the development of a 619,959-square-foot industrial warehouse with 10,000 square feet of associated office space and six commercial/retail buildings totaling approximately 34,000 square feet. Due to entitlement requirements under Amendment No. 5, SLH proposed to develop the project in two phases. In phase one, SLH would develop

the light industrial warehouse. Roughly a year later, during phase two, SLH would develop the retail/restaurant buildings. The site plan for SLH's proposed two-phase development of the project is depicted below.




63. As part of the application process, the City prepared a Consistency Checklist to analyze whether SLH's proposed project was consistent with the Sun Lakes Village North Specific Plan as updated by Amendment No. 5. It found that it was, stating that "the Project is equal to or less intense than what was planned" in Amendment No. 5. The City's summary of the Consistency Checklist analysis (updated as of February 10, 2022) is below (highlighting added):

**Table 1**
**Banning Point Project v. SLVNSP – Consistency Analysis**

| Characteristic | SLVNSP Designation BW | RS | Banning Point Project Warehouse | Retail | Consistent? |
|---|---|---|---|---|---|
| Land Use | Business & Warehouse | Retail & Service | Warehouse | Retail and Restaurant Pads | Yes |
| Allowed Uses[1] | Warehouses | Retail and restaurants | Warehouse | Retail and Restaurants | Yes |
| Acres | 30.22 | 6.83 | 30.22 | 6.83 | Yes |
| FAR (maximum) | 0.55 | 0.60 | 0.47 | 0.11 | Yes |
| Allowed Area (SF)[2] | 877,298 | 37,189 | 619,959 | 34,000 | Yes |
| **Landscaping Setback (feet)** | | | | | |
| Sun Lakes Blvd. | NA | 20 | NA | 20 | Yes |
| North SP Boundary | 10 | NA | 10 | NA | Yes |
| West SP Boundary | 10 | 10 | 10 | 10 | Yes |
| **Building Setback (feet)** | | | | | |
| Sun Lakes Blvd. | NA | 25 | NA | +100 | Yes |
| North SP Boundary | 20 | NA | +120 | NA | Yes |
| West SP Boundary | 20 | 10 | 50 | +50 | Yes |
| **Other Guidelines** | | | | | |
| Interior Lot Line | 20 | 0 | NA | NA | NA |
| Building Height[3] (feet, maximum) | 55 | 35 | 47.5 | 20.5 | Yes |
| Parking[4] | 360 | 146 | 402 | 289 | Yes |
| Landscaping | 15.0% Zoning Code Chapter 17.32 | | 16.2% Will be built per Code | | Yes |
| Lighting | Zoning Code Sect 17.12.170 | | Will be built per Code | | Yes |
| Walls and Fences[5] | Zoning Code Sect 17.24.080 | | Will be built per Code and SLVNSP | | Yes |
| Signs | Zoning Code Chapter 17.36 | | Will be built per Code | | Yes |

Sources: Sun Lakes Village North Specific Plan Amendment No. 5, Tables 1 and 2 (11-4-20), PEIR (10-28-20), Banning Point Conceptual Plan dated 9-29-20, Revised Landscape Plan (8-4-21), and revised Project Plans (August 2021).

**NOTES**
BW Business & Warehouse District
FAR Floor Area Ratio (building area/site area)
NA Not Applicable
RS Retail & Service District
SF Square Feet
SLVNSP Sun Lakes Village North Specific Plan
SP Specific Plan

[1] SLVNSP Table 1, Allowable Land Uses
[2] SP numbers based on industrial park and commercial retail uses evaluated in PEIR
[3] Architectural projections and focal elements may exceed the height limit up to 25 percent.
[4] Per Zoning Code Chapter 17.28 based on building type and square footage
[5] Per Code except walls and fences may exceed the maximum height specified in the Banning Zoning Code to satisfy the screening requirements of the SLVNSP Design Guidelines.

**F. In early 2022, the City approved the entitlements required for SLH's Banning Point project, including design review, over PAG and Flynn's objections.**

64. Over the next several months, the City reviewed SLH's applications for the Banning Point project, including an application for design review approval (Banning Mun. Code § 17.56.050) and tentative parcel map approval (Banning Mun. Code § 16.14.050(B)), as well as the project's CEQA document, an Addendum to the previously approved Program EIR for Amendment No. 5 to the Sun Lakes Village North Specific Plan.

65. On October 19, 2021, the City Planning Commission held a public hearing to consider the project entitlements. At the hearing, City staff and SLH representatives provided detailed presentations on the project and fielded questions from the Planning Commission. After taking public comment, the Planning Commission voted to continue the hearing to allow for additional discussions on the project.

66. Among those in opposition to the Banning Point project was Flynn, a fairly new resident of Banning (SLH is informed and believes that Flynn moved to Banning in 2019), and other PAG members. *Flynn repeatedly voiced her opposition to the project at numerous Planning Commission and other public hearings*.

67. In a Facebook post directed to Councilmember Hamlin, Flynn accused SLH of lying about the scope and impacts of the project (highlighting added):

> **Sheri Flynn**
>
> With 190 or so truck bays planned it defies logic that there would be 13 trucks a day! And this will be 24/7!
>
> Where is the new TIA Mary?? I requested ALL documents related to this project from Adam Rush on October 18th and was given NO traffic studies.
>
> Tell me Mary- where can I send you the 3 detailed environmental reports that showed this project and the EIR to be totally deficient and not specific to a 620,000 sq.ft. Warehouse ?? You sold out the District you represent! You are either being lied to by the developers and City Staff, ignorant, or in on it, possibly all 3! Resign or you will be recalled!

68. In public comments for the October 19, 2021 meeting, Flynn demanded that the land be used for something that would benefit her and her neighbors (highlighting added):

> THE CITY IS OVERRIDING SIGNIFICANT IMPACTS IDENTIFIED AS: AIR QUALITY, GREENHOUSE GAS EMISSIONS, LAND USE AND PLANNING, AND VEHICLE MILES TRAVELED. THIS IS UNACCEPTABLE AND I ENCOURAGE THE CITY TO RECONSIDER THE PROJECT AND DROP THE INDUSTRIAL WAREHOUSE AND INCREASE USEFUL RETAIL INSTEAD.
>
> SINCERELY,
>
> SHERI FLYNN

69. On December 1, 2021, the Planning Commission reconvened and, after taking further public comment and deliberating thereon, voted to accept City staff's recommendation to approve the project entitlements. More specifically, the Planning Commission voted to approve Design Review No. 21-7008, and to recommend that the City Council approve Tentative Parcel Map No. 38164. As part of its recommendation, the Planning Commission adopted the required findings for both the project's Design Review approval and the Tentative Parcel Map.

70. On information and belief, in public comments for this December 1, 2021 meeting, Flynn called the scope of the project a "bait and switch," meaning that SLH was proposing a larger, more impactful project than Amendment No. 5 contemplated. This was false. As the City's Consistency Checklist analysis found, "the Project [was] equal to or less intense than what was planned" in Amendment No. 5

71. On January 11, 2022, Flynn's PAG appealed the Planning Commission's approval of Design Review No. 21-7008 and recommendation for approval of Tentative Parcel Map No. 38164 to the City Council. The appeal hearing was set for February 17, 2022.

72. According to PAG board meeting minutes from December 2021 and January 2022 produced by Flynn in this litigation, Flynn and another PAG member, Diane Berley, led PAG's legal strategy in opposing the project. The two were PAG's points of contact with its attorney, Gabriel Ross of Shute, Mihaly &

Weinberger. Minutes reflect that Flynn and Ms. Berley had an "extensive call" with Mr. Ross's office the week of January 11, 2022 and that Flynn had had a "great deal of input into the letter" PAG's attorney sent to the City regarding the appeal. Minutes for PAG's January 25, 2022 meeting note that Flynn questioned why SLH "would get to speak at all" at the hearing on the appeal.

73. SLH offered to meet with PAG to discuss their concerns but PAG, declined. SLH is informed and believes, and based thereon alleges, that the refusal was due to Flynn's influence.

74. On February 17, 2022, all but one of the City Councilmembers (Councilmember Hamlin) voted to deny the PAG appeal and approve the project, including approval of Design Review No. 21-7008 and Tentative Parcel Map No. 38164 and adoption of the project's CEQA Addendum. This approval included the detailed findings required by the Banning Municipal Code. *See* Banning Mun. Code § 17.56.050 (design review); Banning Mun. Code § 16.14.050 (tentative parcel map findings).

75. The City Council's findings in approving Design Review No. 21-7008 included:

- "The proposed project is consistent with the general plan."
- "The proposed project is consistent with the Zoning Ordinance, including the development standards and guidelines for the district in which it is located."
- "The design and layout of the proposed project will not unreasonably interfere with the use and enjoyment of neighboring existing or future development and will not result in vehicular and/or pedestrian hazards."
- "The design of the proposed project is compatible with the character of the surrounding neighborhood."

76. The City Council's findings in approving Tentative Parcel Map No.

38164 included:

- "Tentative Parcel Map No. 38164 is consistent with the goals, policies and programs of the City's General Plan and with the Sun Lakes Village North Specific Plan Amendment No. 5."
- "The design and improvement of the subdivision proposed under Tentative Parcel Map No. 38164 is consistent with the City's General Plan and the Sun Lakes Village North Specific Plan Amendment No. 5."
- "The subject site is physically suitable for the type of development proposed under Tentative Parcel Map No. 38164."
- "The site is physically suitable for the proposed density of development under Tentative Parcel Map No. 38164."
- "The design of the subdivision and improvements proposed under Tentative Parcel Map No. 38164 are not likely to cause substantial environmental damage or substantially and avoidably injure fish or wildlife or their habitat."
- "The design of the subdivision and improvements proposed under Tentative Parcel Map No. 38164 are not likely to cause serious health problems."
- "The design of the subdivision and improvements proposed under Tentative Parcel Map No. 38164 will not conflict with easements, acquired by the public at large, for access through or use of, property within the proposed subdivision."
- "The design of the proposed Tentative Parcel Map No. 38164 provides, to the extent feasible, for future passive or natural heating or cooling opportunities in the subdivision."
- "The discharge of waste from the proposed subdivision into an existing community sewer system would not result in a violation of

existing requirements imposed by the California Regional Water Quality Control Board."

77. Flynn emailed comments for inclusion in the public record for the February 17 hearing and spoke at the hearing. In her comments, included in the City's Administrative Record in this case, Flynn called SLH "a ruthless, build at all costs developer from Arizona" and "self-serving" and argued that the land should instead be used for amenities for residents such as "a park, skating rink, [or] much needed restaurants and stores." (highlighting added).

**From:** Sheri Flynn <lorijean1250@yahoo.com>
**Sent:** Thursday, February 17, 2022 9:15 PM PST
**To:** Sandra Calderon <scalderon@banningca.gov>
**Subject:** Good Evening Sheri Flynn PAGFirst a few facts- 1. The Retail was to be built first NOT SECOND to shield Sun Lakes residents from noise, pollution, ground vibration and visual blight. Once the warehouse is complete, the retail will never be built. We will look at and hear semi trucks at loading docks 24/7. 2. The Specific Plan allows semi trucks to come from Sunset go west onto Sun Lakes Blvd extension and turn right into the industrial warehouse , then exit back to Sunset, thus going 2x's through senior homes on both sides. This has far more environmental impact than previously identified in the EIR. 3. NOW THIS IS THE REALITY You take Two outside people Doug Schulze and Adam Rush along with the most short sited, uninformed and disconnected City council ever elected, add a ruthless, build at all costs developer from Arizona and what do you get? 4. 12 warehouses encompassing almost 7.5 million sq ft of prime Banning land. Land that could be used for such things as a park, a skating rink, much needed restaurants and stores,and we could keep the sales tax generated from these establishments in Banning. 5. Instead we have the council in effect saying that Banning residents don't deserve those things. Instead the vision is for Banning to be known for low paying, soon to be automated, pollution and traffic spewing warehouses, along with cannabis shops, endless traffic gridlock, and homeless central. 6. If this project along, with Sunset Crossroads, is allowed to be built your legacy will be the ruination of Banning and the Condemnation of its citizens to a bleak future. 7. You think you are doing what is best for Banning but that is a lie. You have only been shown a carefully crafted one sided view of this project. Be smart, actually read what is written in our attorneys appeal letters, put the time in to really study it. If you do, the only conclusion you can make is to appeal the planning Commission's approval of this poorly thought out project and to move forward and give us something that will benefit Banning and THAT the Citizens actually need, want, and can support. 8. So I would ask you to really think before you vote tonight and that you will decide to do what is best for Banning in the long run not just what the self serving Developers, and City Administrators have sold you for a price. 9. And Despite what some have claimed, the Developers have signed an agreement that they will pay for any lawsuit brought, NOT Banning taxpayers.

78. According to PAG board meeting minutes for February 22, 2022, "Sheri Flynn stated that residents perceive that we want the empty lot to remain an empty lot."

79. Notwithstanding the City's approval of the project, SLH remained willing to engage with PAG about its concerns over the project, believing, wrongly, that PAG/the Sun Lakes community might actually allow development of SLH's property as provided for under the Specific Plan. For that reason, on March 23, 2022, SLH entered into a tolling agreement with PAG and the City to toll and suspend all statutes of limitations for PAG to sue the City and SLH related to the project. Flynn signed this tolling agreement on behalf of PAG, listing her title as

"Pass Action Board Member."


Dated: March 23, 2022

PASS ACTION GROUP

By: Sheri Flynn

Name: Sheri Flynn

Title: Pass Action Board Member

80. Soon after, SLH terminated the tolling agreement when it became apparent that Flynn's (and by extension PAG/the Sun Lakes community's) agenda with regards to SLH's project was simple: prevent the development of the Banning Point project at all costs and have the City bank the property for the Sun Lakes community. As discussed more fully below, Flynn did just that as demonstrated by her unabashed campaign for political power to overturn the City Council's approval of the project and then, once in power, to also retaliate against SLH for having exercised its First Amendment right to advocate for the project and to defend against her efforts to stop the project.

**G. In April 2022, on PAG's behalf, Flynn filed a petition for writ of mandate and a complaint for injunctive relief to challenge the City's approval of the project.**

81. On April 18, 2022, Sheri Flynn, acting as the representative of PAG, sued the City (naming SLH as a real party in interest) alleging that: (1) the City failed to comply with CEQA by not preparing a subsequent or supplemental environmental impact report; (2) Councilmember Mary Hamlin was biased and tainted the City Council's decision-making process; and (3) the findings made for the project's Design-Review approval and the Tentative Parcel Map were unsupported by substantial evidence. The lawsuit did *not* challenge Amendment No. 5. (See *Pass Action Group v. City of Banning*, No. CVRI2201482.)

82. Now-councilmember Flynn signed the verification for PAG's lawsuit (highlighting added):

**VERIFICATION**

I, Sheri Flynn, have read the foregoing Verified Petition for Writ of Mandate and Complaint for Injunctive Relief and know its contents.

I am authorized to execute this verification on behalf of Pass Action Group. I have read the foregoing Verified Petition for Writ of Mandate and Complaint for Injunctive Relief and am familiar with its contents. All facts alleged in the above Petition, and not otherwise supported by exhibits or other documents, are true of my own knowledge, except to matters stated on information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on April 18, 2022, at Banning, California.

Sheri Flynn ______________ Sheri Flynn

83. In PAG's opening brief, PAG accused SLH of "deliberately misleading the public during the Specific Plan approval process and obscuring the fact that the project site would eventually house a large warehouse building," despite the fact that a Business & Warehouse district was always a large portion of the Specific Plan area. On information and belief, Flynn approved of this language.

84. SLH was an active participant in the PAG litigation. As the real party in interest, it had a direct and beneficial interest in the outcome of the case and was both motivated and required to defend against PAG's claims. The PAG litigation involved a challenge to the City's approval of SLH's development project and, as noted below, SLH was obligated under the project's conditions of approval to defend and indemnify the City against any third party challenge to the project approvals. SLH filed a 32-page verified answer responding to and rebutting PAG's allegations and asserting numerous affirmative defenses. SLH and the City filed joint briefs and jointly argued at hearings. For example, SLH and the City's attorneys co-wrote a nearly 40-page brief in opposition to PAG's petition for writ of mandate and divided topics to argue at the hearing, with SLH's counsel successfully arguing the primary CEQA and zoning claims asserted by PAG. As explained in Section I, *infra*, the Superior Court found that the "City's conclusion

that the Project is consistent with the general plan and specific plan amendment is supported by substantial evidence."

85. SLH indemnified the City in the PAG litigation according to the terms of the Conditions of Approval included in the City's resolution approving the project, which stated: "The applicant [SLH] shall indemnify, protect, defend, and hold harmless, the City … from any and all claims, demands, lawsuits, writs of mandamus, and other actions and proceedings … brought against the City … that challenge, attack, or seek to modify, set aside, void, or annul, the action of, or any permit or approval issued by, the City … for or concerning the project …."

86. At the end of the litigation, SLH was heavily involved in negotiating a settlement agreement concerning PAG's demand for attorney fees and costs (which SLH was responsible for paying pursuant to the above-referenced conditions of approval). Pursuant to that settlement agreement, SLH agreed to and did pay PAG $200,000 for its attorney fees and costs, which was the entire settlement amount.

**H. In September 2022, following Flynn's months-long smear campaign, Councilmember Hamlin resigns – creating a seat on the City Council for Flynn.**

87. While PAG's petition and complaint was pending, Flynn launched a campaign for signatures to hold a special recall election for Councilmember Hamlin's seat as the head of City Council District Three. In roughly two months, Flynn obtained the requisite signatures to place Councilmember Hamlin's recall election on the ballot, all while blaming the entire City Council for approving the Banning Point project entitlements and implementing Amendment No. 5. Below are excerpts of Flynn's letter to readers of the City's newspaper, the Record Gazette, touting herself as the "leader of the recall" (highlighting added).

https://www.recordgazette.net/opinion/letters_to_editor/aug-26-2022/article_78b51f7c-2a09-11ed-a95f-93cbe3bf9c2a.html

Aug. 26, 2022

Sep 1, 2022

As the leader of the recall of Mary Hamlin, city councilperson, District 3, I would like to thank all those who helped launch, execute and collect signatures to successfully get the recall on the ballot. It would not have happened without your dedication and perseverance.

Again, thank you!

A recall is an example of direct democracy and one of the few avenues open to citizens to remove an elected official who refuses to represent their best interests- who puts their own personal conscience or financial gain before the needs, desires, health and welfare of their constituents.

We had over 1,800 actual signatures, collected over a 70-day period. We submitted 1,686 to the Registrar of Voters with 1,604 accepted out of the 1,259 required to place it on the ballot.

The entire city council, did a great disservice to the Sun Lakes community, by voting for the zone change that opened the door to a 620,000-square-foot industrial warehouse just feet from a memory care and hospice facility and directly across from a well established 6,000-plus senior residential community. The environmental impact report (EIR) and zone change from commercial/retail to industrial warehouse was prepared and passed under the cover of COVID — a time when no one would leave their homes and most were glued to the numbers ticking off on their TV screens.

Once Sun Lakers found out about the warehouse, almost a year after the zone change and EIR were already approved, you ridiculed and dismissed our valid concerns of harmful air and noise pollution, increased traffic and the overall lowering of our quality of life. Mary Hamlin claimed that it was only a few vengeful people who wanted her recalled. All those who were eager to sign the recall proved that arrogant assumption wrong.

You never once have apologized or admitted your mistakes and continue to defend them.

88. SLH is informed and believes that by September 2022, Flynn had successfully ousted Councilmember Hamlin and forced her resignation, ultimately resulting in Hamlin's moving out of California, fearing for her family's safety. On information and belief, Flynn then wasted no time campaigning to take Councilmember Hamlin's seat on the City Council to wield the political power for her own self-interest and stated goal of preventing the development of the Banning Point project, so as to prompt the City to bank the property for the Sun Lakes community.

89. Flynn's official candidate statement in her campaign for City Council highlighted her opposition to warehouse development, vowing not to "approve or allow any warehouses to be located in residential communities":

> I will provide strong, decisive leadership and a long range vision to move banning forward. For too long Banning has suffered from mismanagement, self-dealing, blight, and a lack of cohesiveness. *I will not approve or allow any warehouses to be located in residential communities*. My goal is to set Banning back on a path of progress, fiscal responsibility, transparency, and regeneration. I respectfully ask for your vote to serve our great community. [Emphasis added.]

90. This included the Banning Point project. As Flynn admitted in verified discovery responses in this litigation, she considers the project to be incompatible "with its residential surroundings" (highlighting added):

> Neither the Tentative Parcel Map nor the Design Review which comprise the PROJECT are consistent with the City's General Plan or Sun Lakes Village North Specific Plan for the following reasons:
>
> - The design of the subdivision proposed under Tentative Parcel Map No. 38164 is inconsistent with the General Plan Policy No. 7 of the City's Industrial Land Use Goal which provides that there shall be sufficient industrial lands for manufacturing, warehousing, and distribution, while carefully considering compatibility with adjacent lands. The PROJECT proposes a large truck-intensive building and use with truck access points to the site place immediately adjacent to a quiet planned residential community and assisted living facility. Such a use and intensity of use does not consider compatibility with its
>
> 4935-4754-6986 v3 4 Case No. 5:24-cv-02603-DTB City of Banning's Supplemental Responses to Sun Lakes Highland's Interrogatories, Set One
>
> residential surroundings as required by Policy No. 7 of the General Plan.

91. According to minutes of a September 13, 2022 PAG Board Meeting, members expressed concern that Flynn could be perceived to have a conflict of interest with regards to the project if she were elected to the City Council. One member expressed that "the perception of Sheri Flynn as both City Council representative and Pass Action Group Vice President might be no better than the

type of conflict-of-interest tactics we've accused the City of Banning of taking part in," and noted that it would be a problem for PAG if "Flynn had to recuse herself from discussions and votes related to warehouses."

92. On December 13, 2022, Flynn was elected to City Council and was officially sworn in weeks later. On information and belief, Flynn remained an official PAG Board member even after the special election, only dropping her membership "officially" shortly before being sworn in as City Councilmember.

**I. In March 2024, Flynn's scheme to destroy the Banning Point project hit a snag when the Riverside Superior Court ruled that the City Council's approval of the project complied with CEQA and was supported by substantial evidence.**

93. On March 15, 2024, following briefing and oral argument in PAG's lawsuit against the City, the Riverside Superior Court issued its decision. The Superior Court *rejected* PAG's primary arguments that the City had violated CEQA by approving the EIR Addendum for the project and that the findings made in support of the project approvals and findings of consistency with the City's General Plan were not supported by substantial evidence. The Superior Court found:

> City's conclusion that the Project is consistent with the general plan and specific plan amendment is supported by substantial evidence. The City found that the Project will not unreasonably interfere with use and enjoyment of neighboring properties because the warehouse is to be built up against the 1-10 freeway and the railroad away from residences; it will back up against Sun Lakes Village Shopping Center buildings away from residences to the south and east; and the retail and offices uses will provide screening/buffering from these residential uses "*in the future*." AR 81 (emphasis added by Petitioner.) However,

> as argued by the City, there is nothing in its findings that required the retail and office elements (R&S District) would be built before or concurrently with the warehouse or would change the findings if the retail and office space were developed later. That an alternative condition could be proposed to address Petitioner's screening concerns—requiring the landscaping—and was adopted supports the City's finding. City could and did find that landscaping is a reasonable alternative for buffering to the construction of the office and retail space.

94. The Superior Court also *rejected* PAG's assertions that Councilmembers Torres and Wallace were improperly biased in favor of the project; however, in a narrow and limited ruling, the Superior Court found that Councilmember Hamlin had made public statements that gave rise to an unacceptable probability of a risk of bias (even though she had voted to deny the project).

95. In sum, the Superior Court found that the City had done everything right under CEQA in approving the project, including making appropriate underlying findings, but that PAG had created enough of a question as to Councilmember Hamlin's potential bias (again, even though she'd voted *against* the project, and again, supported by far less evidence of bias than SLH presents here) that the City had to re-vote, without Councilmember Hamlin.

96. The Superior Court thus ordered that a writ of mandate be issued directing the City to: (i) vacate and set aside the project approvals that were considered at a hearing by Councilmember Hamlin; and (ii) ensure that any future hearings related to the project approvals be conducted without the participation of Councilmember Hamlin (who, by that time, had already been replaced by Sheri Flynn as part of Flynn's coordinated effort to seize power at the City).

97. SLH had no reason to expect that the project would not be approved again, given (1) it had already been approved and the Superior Court upheld the prior CEQA document in the PAG litigation, (2) the Councilmember who would not be participating in the re-vote was the only person who had voted against the project the first time, and (3) it complied with the City's approved Specific Plan.

**J. Just before the July 9, 2024 public hearing, Flynn coached PAG members to speak at the hearing and to submit comments in opposition to the project.**

98. In accordance with the trial court's March 15, 2024, ruling and subsequent writ of mandate, the City Council scheduled a public hearing for July 9, 2024, to (i) vacate and set aside the 2022 project approvals; and (ii) reconsider the project without the participation of Councilmember Hamlin.

99. Unbeknownst to SLH, and despite her role as a presumed objective, and unbiased decisionmaker for the City (as the City's own code of conduct [Banning Municipal Code, § 2.04.080] requires), Councilmember Flynn attended and spoke at a PAG townhall meeting on July 3rd – mere days before the July 9th hearing – and pushed for its members to attend the July 9th meeting to oppose the project. She cajoled them to send letters to the City Council and she instructed the PAG members how to ensure that their comments were included as part of the record of proceedings. Despite her history with PAG and clear bias against SLH and its project, Flynn also told everyone at that meeting that she had no intent to recuse herself and that she had an obligation to let people know her stance on the Banning Point project.

100. For example, Flynn stated:

> "I just wanted to comment on when you go to speak, uh,
> in January the City Council went to action minutes only,
> so if you go to speak and you do not send it in by email or
> by mail, whatever you want to send in, it will not be

placed in the minutes and it will not be recorded. So you must also speak but also turn whatever you speak into a city clerk by 5 pm preferably the day before but you can get it in as late as 5 pm the day of and I just want to make sure everyone knows that because you'll go up there and speak and there will be no record of it other than a video that you would have to watch. No verbatim. Verbatim is no longer being used. It is action minutes it only records in the minutes what action was finally taken. The votes and what action was finally taken. The votes and what anyone says or even whether you're for or against something is not even recorded. *So be sure to send in your comments ahead of time* [emphasis added].

So, on the 9th, you should send in to make sure it gets to the City Clerk by the 8th but she should still accept them by 5 pm on the 9th. To the City Clerk. You must mail it to the City Clerk which is Caroline Patton. So its cpatton@banningca.gov.

*Not only do I have an obligation to let people know where I stand, I have a duty to let people know where I stand. And so I am not going to recuse myself.* [Emphasis added.] [Applause] *And I think I have a lot of valuable information to give, and that is why I'm not recusing myself. And I do not have to recuse myself.*" [Emphasis added.]

101. Flynn's statements and refusal to recuse herself were in direct violation of the City Council Manual § 7.1, which states:

> (d) Although every Legislative Body member has a right to their own personal opinions, Legislative Body members should by their demeanor show an ability to listen to a variety of viewpoints and demonstrate a reasonable willingness to consider all sides of an issue before them. For quasi-adjudicative matters involving public hearings, the members of the Legislative Body *shall not prejudice the matter prior to the public hearing, shall be fair and impartial, and shall decide the matter based upon the evidence and the statutorily required findings*. [Emphasis added.]
>
> (e) For such matters, Legislative Body *members should avoid expressing an opinion or divulging their thought process until after the public hearing has been completed*. [Emphasis added.]

102. The City Council Manual "shall govern the conduct and procedures applicable to meetings of the city council and related city bodies, boards and commissions," per the Banning Municipal Code § 2.04.080.

103. On information and belief, Councilmember Flynn knew that she was biased and that her participation in the vote was a violation of law. Years earlier, Flynn told other PAG members that a council member's pre-hearing comments can be used to demonstrate bias and trigger recusal—PAG meeting minutes for a February 8, 2022 meeting include that "Sheri Flynn stated that our attorney feels that [comments] made by members of the City Council can be used to get them recused from further activities due to bias. We were asked to check our email accounts, as those can be included." Flynn's pre-hearing conduct and statements were far more egregious than what she (through PAG) complained of in PAG's litigation. There, PAG alleged that Councilmember Hamlin had made public

statements in support of the project, including transmitting written statements in support of the project to a local community group, prior to the City Council's hearing. Here, Flynn campaigned publicly for years against the project, was a key board member behind PAG's litigation against it, and, even after she was elected to the City Council, spoke at a PAG meeting to direct members to submit comments opposing the project.

### K. At the July 9, 2024 public hearing, Flynn used her position as councilmember to taint the vote and stop the City Council from reapproving the project

104. During the July 9th public hearing, Councilmember Flynn openly echoed PAG's anti-growth agenda, reading from what appeared to be a pre-prepared list of questions and statements that were identical to the baseless claims and allegations raised by PAG in its lawsuit that the Banning Point project was inconsistent with the policies, goals, and objectives outlined in the City's General Plan and Amendment No. 5—all of which the Superior Court expressly rejected in its March 15, 2024, ruling.

105. Also during the July 9th public hearing, Councilmember Flynn questioned SLH's representative, Josh Zemon, about a "rumor" that SLH had contributed $4,000,000 into a City "housing authority fund" in 2019 that was the alleged basis for former Councilmember Hamlin's statements that the project would generate an approximate equivalent amount of revenue for the City. Flynn's clear intent in this line of questioning—based upon admittedly nothing more than mere "rumor" and speculation—was to imply that SLH was improperly (and indirectly) attempting to "buy" councilmember votes for the project before the 2022 hearing through the alleged housing-fund contributions. Although Mr. Zemon stated unequivocally that no such payment or donation had ever been made either by or on behalf of SLH, the damage caused by Councilmember Flynn's question and the associated implication was already done.

106. Councilmember Flynn's badgering was all the more threatening given the greater context of her relentless suppression of dissent and disregard for free speech. For example, Councilmember Flynn had taken to suppressing residents' dissenting views on her social media page.

107. One resident complained to the City Council regarding Flynn's "censoring [of] constituents who express differing opinions" on Facebook (highlighting added).

**Sent:** Monday, March 18, 2024 3:23 PM
**To:** Doug Schulze <dschulze@banningca.gov>; Alberto Sanchez <asanchez@banningca.gov>; cwallace@baningca.gov
**Subject:** Formal Complaint abouttCity Councilman District 3 -Sheri Flynn

Dear City Council members:

I would like to formally complain about City Councilman Sheri Flynn who has taken it upon herself to censor me and not allow me to see her posts on the District 3 Banning City Council FB page, nor post any opposing views without her first approving them.

I would like to know the regulations or guidelines in Banning regarding a city council member like Sheri Flynn, who not only campaigned on her District 3 "Banning City Council Website" but is censoring constituents who express differing opinions.

108. Another resident wrote, "I've witnessed CM Flynn heckle community members who have an opinion contrary to her own during public comments," and complained about Flynn talking over other council members and "mumbling cuss words when she thought no one was listening" (highlighting added).

**Sent:** Tuesday, July 9, 2024 4:37 PM
**To:** City Manager; Alberto Sanchez; Rick Minjares; David Happe; Colleen Wallace; Caroline Patton
**Subject:** Request for Action About a Council Member's Behavior
**Attachments:** Tonight's City Council Meeting June 25, 2024.eml

Dear City of Banning Representatives,

I've forwarded the last email I sent to all of you (June 25, 2024) concerning behavior of Council Member Sheri Flynn at council meetings, on social media, and most recently in person. I never received a reply email, nor did I see any improvement in the behavior I cited that damages our city's reputation, community confidence, and now, my personal safety.

I've witnessed CM Flynn heckle community members who have an opinion contrary to her own during public comments. "Wipe that smile off your face" (directed to Chef Jeff Platt), "You're a liar" (directed at me when I stated I'd emailed and left a phone message on her city phone-she later found out she had IT problems.) She has overtalked every one of you, including the District Attorney, and not faced consequences.

On Facebook and elsewhere, she calls you (as a group or individually) "rubber stampers, liars, harassers, crooks accepting illegal donations via pay for play agreements, unintelligent, felons, uneducated, lazy"...and mumbled cuss words when she thought no one was listening.

109. On information and belief, Flynn harassed city employees as well including in or around 2024 when a city employee accused Flynn of harassment and creating a hostile work environment. Flynn felt the need to set up a legal defense fund and solicit contributions from her supporters on her Facebook page:




110. Flynn had also vehemently opposed Councilmember Happe's reappointment to the City Council on the grounds that he, in her words, supported "unlimited" warehouses "ZERO ft. away" from sensitive areas (highlighting added).

**From:** Sheri Flynn <sflynn@banningca.gov>
**Sent:** Sunday, February 04, 2024 12:34 PM PST
**To:** Rick Minjares <rminjares@banningca.gov>
**Subject:** Fwd: Appeal of Appointment
**Attachment(s):** "2024.01.31 Petition for Writ of Mandate or Prohibition.pdf"

Rick,
The attachment below contains the reasons why an appointment is not appropriate or legal. I truly hope you will take the time to read it and especially consider that Mr. Gonzales was found to have registered to vote in**District** 5 on July 23, 2023. Why is the question. Thisseat can still go to a mailed ballot election in May, June, or August at little cost to the City and will let the citizens decide their representative.
I believe Mr. Happe is the choice that has already been made.
Mr. Happe, lost by 17 votes in the November, 2022 election, however, there were 2 other people on the ballot - Mr. Gonzales and Mr. Dupre. Mr.Dupre had withdrawn from the race but his name was still included on the ballot. He received 328 votes, Gonzales received 548, and Happe, as the incumbent, 531. Obviously, the 328 votes cast for Dupre were not meant to be a vote for Happe. And it can be concluded that if just Gonzales and Happe were on the ballot most of the 328 votes would have gone to Gonzales.
A total of 1407 voted were cast. If Mr. Dupre's votes are added to Mr. Gonzales's (876) you can calculate that approximately 2/3 of the voters would have voted for Gonzales vs 1/3 (531)to the incumbent Happe a clear rejection of Happe. I think it would be an insult added onto an injury if this Council voted to first, appoint, (illegally) without letting those in District 4 vote, and then to choose the one replacement that they voted out.

I also might add that Happe is for unlimited cannabis and warehouses, was financed by developers, including Diversified Pacific in his last campaign, voted to unjustly remove Planning Commissioner Marco Santana because he dared to express his GENERAL views on warehouses, and motioned and got passed a resolution to place cannabis/, warehouses not 300 feet away from sensitive receptors, but to allow them to be placed ZERO ft.away! He also expresses in his statement little concern for the citizens of Banning and even derides them for expressing their concerns and frustrations.
We certainly do not need a Happe repeat that has not served the city well in the past, and I fear will continue failed policies in the future if appointed.
I hope you will seriously consider the information I have presented to you.
Sincerely,
Sheri Flynn

111. And, Councilmember Flynn had gone out of her way to warn Councilmember Minjares that there is no ability to fine council members (like herself) for making "disparaging" remarks about other council members, implying that she could disparage him, or other council members who dared to cross her, with impunity (highlighting added).

**From:** Sheri Flynn <sflynn@banningca.gov>
**Sent:** Tuesday, March 26, 2024 11:38 AM PDT
**To:** Rick Minjares <rminjares@banningca.gov>
**Subject:** Item 9.1

Rick,
FYI
Since at least 1997, the city has required any meeting to be continued past the set curfew must be voted on unanimously.

Resolution, 1997–33 required at 10 PM curfew with a unanimous vote.

Resolution 2010–38 changed the curfew from 10 PM to 9 PM and required a unanimous vote.

Resolution, 2016–44 set the curfew back at 10 PM, but still required a unanimous vote.

The first photo is from the Palm Springs municipal code. Palm Springs, nor any other California city that I can find, nor Doug can confirm, can impose a fine on council members who make "disparaging" remarks to other council members.
Sheri

112. Flynn's threats against her fellow council members were not only made in private. On information and belief, at a community dinner in or around June 2023, in the presence of elected officials from surrounding communities, Flynn accused the other members of her city council of corruption and said that they could not be trusted to serve the community. Then-Mayor Pro Tem of Palm Desert, Karina Quinanilla, later wrote to the Banning City Council to express her concern regarding Flynn's comments at the dinner, writing: "As a neighboring city, I believe that we all succeed when we collaborate as a region. While we will not always agree 100% with our peers, making flagrantly defamatory remarks about your colleagues is counterproductive at best, and toxic at worst."

113. Later allegations concerning Flynn confirm a pattern of hostile behavior toward anyone she perceives to be her enemy. On information and belief, in May 2025 Councilmember Colleen Wallace filed a formal HR complaint against Flynn, alleging repeated hostile behavior, including verbal confrontations and intimidation. Also on information and belief, when Flynn found out about this, she was furious and took steps to further intimidate and harass Councilmember Wallace. At a public City Council meeting on May 26, 2026, Flynn introduced a motion to censure Wallace for daring to file a complaint, arguing that any complaints between council members should go through the city manager or city attorney rather than human resources. On information and belief, Flynn's true

motivation for introducing the motion to censure Wallace was a desire to harass and retaliate against Wallace rather than a genuine concern for the procedure followed. This incident confirms Flynn's pattern of retaliating against those who cross her.

114. As a result of Councilmember Flynn's bias, culminating in her pressure campaign to silence anyone who ventured to disagree with her and support the Banning Point project, Councilmember Happe, who previously voted to adopt the necessary findings to approve Sun Lakes Highland's project, now felt compelled to oppose the project. Likewise, Councilmember Minjares also under pressure from Flynn's biased campaign, now felt compelled to oppose the project. But the three opposing Councilmembers that made up the majority of the City Council had a problem—they could not present rational or legally proper findings to deny the project.

115. By allowing Councilmember Flynn to participate in the July 9th hearing and decision on the project despite her clear, unequivocal bias against the project, the City violated SLH's (and the public's) procedural and substantive due process rights to a fair hearing before unbiased decisionmakers. *See* Banning Municipal Code § 17.48.020(A) ("Requests for permits and other regulatory determinations must be processed fairly, and evenhandedly . . . *so that due process is provided*") (emphasis added). The City and Flynn also took these actions to retaliate against SLH for having exercised its First Amendment rights by advocating for its project and participating in the litigation brought by PAG.

**L. Despite *five hours* of testimony and deliberation, Councilmembers Flynn, Happe, and Minjares could not identify or articulate facts to support the findings necessary for denial of the project.**

116. For nearly five hours of the public hearing, Councilmembers Flynn, Happe, and Minjares provided mere unfounded opinions—not facts or evidence—to support their opposition to the project and ignored the multitude of project-design features and improvements that refuted and contradicted their unsupported

opinions and beliefs that the project would be inconsistent with and adversely impact the surrounding community.

117. For example, during the July 9th public hearing, Councilmember Flynn exclaimed to the City Attorney that she could not reasonably be expected to identify the grounds for denial "on the spot." So rather than deny the project, the City Council continued the matter and directed staff to prepare a resolution of denial of the Design Review approval—not the Tentative Parcel Map—based on the following "facts":

- the project is inconsistent with the City's General Plan because: (i) "the circulation element of their design sucks… ," (ii) "the project will not provide a nonpolluting industrial use and will not provide jobs for city residents," and (iii) the project "does not protect residential neighborhoods from potentially significant sources of community noise";
- the project will unreasonably interfere with the use and enjoyment of neighboring existing or future development and will result in vehicular or pedestrian hazards because "there are no protections for pedestrians or golf carts using Sun Lakes Boulevard and connecting it to the project or the project to Sun Lakes"; and
- the project is incompatible with the character of the surrounding neighborhood because: (i) "its proximity to sun lakes, its only 800 ft from residential," (ii) the project site is "landlocked" by residential, and (iii) "the easterly parcel will not be provided with substantial screening and buffering of the residential and assisted living uses to the east of the building."

118. On information and belief, Flynn, Happe, and Minjares knew these stated reasons for opposing design approval were false. Flynn, Happe, and Minjares knew that:

- The circulation element was already found (by the City and the Superior Court) to not unreasonably interfere with the use and enjoyment of the neighborhood or result in vehicular or pedestrian hazards. As the City found when it approved the project in 2022, "[t]he proposed Project locates truck courts and semi-truck circulation towards the interior and northerly portion of the site next to the Southern Pacific Railroad line and Interstate 10 and away from the residential uses in the Sun Lakes Country Club."
- Amendment No. 5 already found that a conforming project was consistent with the General Plan's goal of providing a "balanced mix of non-polluting industrial land uses which provide local jobs for the City's residents." (Ex. A, Amendment No. 5, App'x at pp. A-2 to A-3.)
- Potential noise impacts of the project had been studied extensively and been found to be "less than significant" by the City and an outside consultant. Significant to the analysis was the preexisting noise levels from the I-10 freeway and the freight railroad adjacent to the project.
- The project in fact provided significant "protections for pedestrians or golf carts using Sun Lakes Boulevard and connecting it to the project or the project to Sun Lakes." The project provided that SLH would construct two new traffic signals at both Country Club/Sun Lakes Blvd. and Sun Lakes Village Dr/Sun Lakes Blvd. with improvements including pedestrian crosswalks to connect existing sidewalks, thereby improving overall pedestrian safety. The project further provided that SLH would construct a dedicated golf cart lane and crossing where none currently exists, which would improve golf cart safety and access on Sun Lakes Boulevard.
- The project was not incompatible with its surroundings. The Banning Point property was *never* zoned for residential. As for Flynn, in a public

Facebook post in or around July 2025, Councilmember Flynn admitted that the "Banning Point property across from gate 1 in Sun Lakes was zoned Commercial /Retail until it was changed to allow industrial warehouses in December 2020. It was never zoned for residential." And, the City, when adopting Amendment No. 5, determined that a conforming project would be consistent with the General Plan and, by extension, compatible with its surroundings. The City determined that SLH's project was compatible with its surroundings when the City first approved the project in 2022, and the Superior Court in the PAG litigation found that the "City's conclusion that the Project is consistent with the general plan and specific plan amendment is supported by substantial evidence."

- The property was not "landlocked" by residential. Multiple large retailers sit directly west of the property. A freight railroad sits directly to the north of the property, and the I-10 freeway sits directly north of the railroad:




- Properties east of the project would be provided with substantial screening and buffering. Amendment No. 5 provided for the use of "evergreen screen trees along with shrubs and groundcover to create a 20-

foot wide landscape buffer along the northeastern Specific Plan boundary adjacent to the existing residential parcels."

119. Despite knowing its stated reasons for denying the project were false and not based on the enumerated factors the Banning Municipal Code required the Councilmembers to consider, Flynn, Happe, and Minjares succeeding in forestalling any vote on the project until after staff prepared a resolution detailing their stated reasons for denying the project.

**M. Soon after the July 9th public hearing, SLH discovered and called out Councilmember Flynn's bias based on her participation in the July 3rd PAG meeting and called out the inadequacy of the City's evidence in support of its findings for denial of the project.**

120. The City, again, made no decision at the July 9 public hearing.

121. Shortly after the July 9th public hearing, SLH learned of Councilmember Flynn's participation in the July 3rd PAG meeting based on a video recording of that meeting posted on the Internet. SLH's review of that video recording made clear that Councilmember Flynn was "coaching" the PAG Board and community members on how to oppose the project to the City Council, in violation of her duty as a Councilmember to be "fair and impartial" and to "avoid expressing an opinion or divulging their thought process until after the public hearing has been completed." (City Council Manual § 7.1(d), (e).) And the statements made by Councilmember Flynn and the PAG members showed that they considered themselves a singular, cohesive team whose mission was to generate opposition to the Banning Point project. The PAG members expressly stated that Councilmember Flynn was "on our team" in advising that no letters opposing the project need to be sent to her attention before the July 9th meeting—a statement that Flynn did not contradict.

122. In its July 25, 2024, letter, SLH informed the City's mayor and the City Council of this clear and unequivocal evidence of Councilmember Flynn's pre-

hearing bias and commitment to oppose the Banning Point project. Yet the City remained silent, taking no action to conduct a new, fair, and unbiased public hearing on the Banning Point project.

123. In an August 22, 2024 Facebook post, Flynn continued her pressure campaign against Councilmember Happe (who had voted in favor of the project in 2022 but, under Flynn's influence, changed course at the July 9, 2024 hearing). Flynn questioned whether Happe would support the project again after an upcoming election and stated, "I don't hold anything past these people in order to get what they want" (highlighting added).




124. On August 29, 2024, PAG's attorney sent a letter to, among others, the City's mayor and the City Council in an attempt to defend Councilmember Flynn's participation in the July 9th public hearing and the City Council's "evidence" in support of its findings for denial of the project. First, the August 29th letter tried to "spin" Councilmember Flynn's role at the July 3rd PAG meeting as purely informational despite her extensive comments that clearly showed her "coaching" the PAG Board and community members on how to oppose the project to the City Council. Next, the August 29th letter contended that SLH's objections to Councilmember Flynn's participation in the hearing were untimely because SLH could have discovered the video recording of the July 3rd PAG meeting before the

July 9th public hearing. Finally, PAG's letter simply repeated Councilmembers Flynn's, Happe's, and Minjares' unfounded opinions in support of their opposition to the project, ignoring the project's many features and improvements that refuted and contradicted their unsupported opinions and beliefs that the project would be inconsistent with and adversely impact the surrounding community.

125. PAG's baseless legal and factual contentions were addressed in a subsequent September 9, 2024, letter from SLH's counsel to the City's mayor and City Council. Again, the City took no action to conduct a new, fair, and unbiased public hearing on the Banning Point project.

126. Councilmember Flynn has asserted that a March 24, 2023 Letter from the California Fair Political Practices Commission blessed her participation, despite her personal embroilment in the issue. The letter, however, addressed whether Flynn needed to recuse because of the physical proximity of her residence to the project. The Commission's letter did not consider whether Flynn had a "common law conflict of interest," stating: "we caution that our advice is limited to the provisions of the Act and Section 1090. The Fair Political Practices Commission cannot provide advice outside of these provisions. Accordingly, we express no opinion regarding the potential application of common law conflict of interest provisions." And the letter pre-dated Flynn's comments at the July 3 PAG townhall meeting.

**N. After depriving SLH of a fair public hearing on July 9 for the first time, the City Council denied SLH a fair public hearing twice more, on September 10 and October 8, 2024.**

127. Specifically, on September 10 the City Council, continuing to be tainted by Councilmember Flynn's bias, then held another hearing and denied SLH's project. Then, again, after SLH had made a timely request for reconsideration, providing even more evidence of Flynn's bias, Flynn participated in an October 8 hearing on the reconsideration request, on which two council

members made a motion. But at Flynn's urging, they withdrew the motion and denied SLH's request for reconsideration

128. On September 10, 2024, the City Council held its then-final hearing on SLH's project. City staff prepared three resolutions for the City Council to consider:

- Resolution 2024-149: a resolution *approving* the design review approval, the parcel map, and ultimately the project. As the City staff pointed out, the trial court already upheld the findings approving the project. Staff also referred back to the July 9, 2024, staff report where it meticulously went through each of the finding requirements and explained in detail why the project satisfied each of those findings.
- Resolution 2024-150: a resolution that *approved* the parcel map, but denied the design review approval. City staff indicated that the "facts supporting findings for denial of [the design review approval] include facts articulated by Councilmembers Minjares, Flynn, and Happe on July 9, 2024," which are discussed above. *But staff cautioned against this approach and instead pleaded with the City Council to first consider Sun Lakes Highland's request for a new, impartial hearing.*
- Resolution 2024-151: a resolution that provided an outright denial of the project. Staff provided no comment on this resolution, but the lack of supportable findings within the resolution itself made it clear that staff did not believe the City was justified in making these findings.

129. The City Council ultimately adopted Resolution 2024-151, the one denying SLH's project in its entirety.

130. On September 25, 2024, SLH formally (and timely) requested that the City Council reconsider its adoption of Resolution 2024-151 by noticing a new public hearing on the project as permitted under Banning Municipal Code section 17.68.140. In that request, SLH provided the City with even more evidence of

Flynn's bias. The City's staff prepared a report finding that the request for reconsideration was timely, specifically noting: "The request was also made timely by having been filed within 15 days of the City Council's decision on the matter." Staff further found that in order to grant SLH's request, a City Councilmember would have to formally move to reconsider. (By making the request for reconsideration, SLH also was exhausting its administrative remedies.)

131. SLH based its request for reconsideration, in part, on Flynn's refusal to recuse herself and her bias that infected the July 9 hearing and September 10 denial. The request included even additional evidence of her bias. SLH's purpose in making the request (in addition to saving SLH's project) was to allow the City and Flynn to correct their biased actions and to thus avoid violating SLH's civil and constitutional rights.

132. Because she remained biased and personally embroiled in the issue, Flynn should have recused herself from any deliberation over the request for reconsideration. Instead—and, on information and belief, realizing that the request would be granted without her fist on the scale—Flynn injected herself into the discussion in order to make sure that the request would be denied, that SLH's previously approved project would be finally rejected, and that the Sun Lakes community's quest to undo the 2022 approvals would finally be completed.

133. On October 8, 2024, the City Council considered SLH's request for reconsideration over the course of a 55-minute proceeding. The publicly available video recording of the meeting shows that at the outset of the proceedings, Councilmember Happe questioned whether the Council was conflicted from considering the request in light of the allegations of bias. After assurances from the City Attorney, the Council considered the issue anyway.

134. Also at the outset of the proceedings, the City Attorney specifically noted: "The basic request from the applicant stems from your zoning ordinance, which allows the applicant, or the project proponent, to present facts that they

believe are additional, that they believe would have changed the outcome had the Council considered it or known it at the time, and based on that belief they are requesting that the Council reconsider the item . . . they are requesting that the Council reconsider the item."

135. When Sun Lakes residents demanded during public comment to know why SLH got to request reconsideration, Community Development Director David Newell specifically noted: "This is part of the due process in the Municipal Code . . . it's part of the due process for anyone who goes through that process." He also pointedly stated, "This was not directed by any staff member, it's part of the due process."

136. The publicly available video shows Flynn dominating the proceedings on the reconsideration request, reiterating her positions and further evidencing her bias, stating she had "quite a bit of things to say." When fellow City Councilmember, Mayor Pro Tempore Minjares "called the question" in order to determine whether the Council wanted to move forward with reconsideration, Flynn—perhaps concerned she was losing the issue—prevented them from doing so. Even raising her voice at times, and unironically claiming Mayor Pro Tem Minjares was violating her First Amendment rights in some kind of preplanned ambush, Flynn loudly proclaimed, "I still have things to say" and kept on berating the Council until Minjares withdrew his motion.

137. The City Council then took a 14+ minute off-the-record recess, at the outset of which Flynn stormed off the dais. The rest of the Council followed, proceeding possibly to consider the matter among themselves out of public view and in violation of the Brown Act, before returning and confirming no action would be taken on the motion for reconsideration. Once back on the record, Flynn even stated, "I would like to conclude this and move forward and put this whole thing to rest"—confirming that the approval process was not finally concluded until the City Council had considered the request for reconsideration.

138. Before the proceedings on the motion for reconsideration concluded, Councilmember Happe stated, "I have nothing to add to the defense of Miss Sheri Flynn" and then again acknowledged the SLH had a due process right to bring the request: "I did want to thank the . . . new Community Director for acknowledging and hopefully people understood that this was the applicant's due process right to put this on the agenda and that's why we are given this opportunity to reconsider this. This was simply due process that in any city in the State of California, and maybe in other places, the property owner would have the right to bring this before the Council."

139. The City Council then confirmed the end of the proceedings as a denial of the request to reconsider. The minutes of the meeting further reflect that Minjares brought the motion, that it was seconded, and that in association with a 14+ minute recess the motion was withdrawn with no explanation.

140. This denial left SLH with fully exhausted administrative remedies and with no choice but to seek this Court's assistance in compelling the City's compliance with its constitutional and statutory obligations related to SLH and the Banning Point project.

**O. In December 2024, Flynn strengthened her iron grip on political power with reelection as councilmember and appointment as the City's mayor.**

141. On December 10, 2024, Councilmember Flynn was officially reelected and sworn in as District 3's councilmember for the next *four years* – retaining her seat on City Council until December 20*28*.

142. During her reelection campaign, Flynn saw attempts to campaign against her as a personal insult. She listed the names of individuals supporting her opponent on her Facebook page and accused them of working with SLH to "destroy Sun Lakes with a warehouse," referring to the Banning Point project.



Sheri Flynn
September 13, 2024 ·

Unfortunately, the issue of Banning Point is probably going to continue if the developers make good on their threat to bring a new lawsuit. And the appeal of the judges ruling by PAG is still in play.

That being said, every time I see a pink sign on someone's front yard I think - why? It feels almost like an insult because I believe that I have worked very hard this last year and a half to truly represent the citizens best interests and to bring transparency to a city that often operates under opaqueness.

So you have to ask why the false accusations and rumors that seem to abound and the constant attempts to undermine my efforts and reputation?

But then you must look at who supports my opponent and I believe part if the answer lies there. It's very concerning that the people supporting Debbie are the same people that tried to destroy Sun Lakes with a warehouse and the traffic, noise, pollution, and safety risks associated with it that are just not compatible with the surrounding senior neighborhood. Many have distain for those who reside in my district:

These are some of the people who are supporting my opponent:

143. On December 10, 2024, the newly sworn-in City Council appointed Flynn as the City's mayor under Banning Municipal Code section 2.04.070. In this political position, Flynn was the head of the City Council (Banning Mun. Code §2.04.070(A)(1)) and the "designated representative" for "expressing the official City position on an issue" (City Council Manual § 8.2(a)).

144. On information and belief, the City vested then-Mayor Flynn with significant authority to determine the course of future development of the Banning Point property based on the following mayoral roles and responsibilities:

- Chairing the successor agency to the City's former community redevelopment agency (Banning Mun. Code § 2.04.070(A)(4));
- Chairing the City's housing authority (Banning Mun. Code § 2.04.070(A)(4))
- Appointing the members of the historic preservation commission subject only to the City Council's approval (Banning Mun. Code § 2.46.20(B));
- Appointing *all* City representatives on non-City organizations after consultation with the City Council (City Council Manual § 5.4(a)); and
- Appointing the members of committees, boards, and commissions "to assist in the conduct and operation of the City government" subject to the approval of the City Council (City Council Manual § 5.4(b)(ii)).

145. On information and belief, Councilmember Flynn has already and will continue to use her political office and her position as councilmember to continue blocking SLH's development of the Banning Point project.

**P. On June 8, 2026, the Riverside County Civil Grand Jury releases a report finding Banning in "a significant financial and administrative crisis that appear[s] to be the result of substantial mismanagement and lack of appropriate oversight."**

146. The 2025-2026 Riverside County Civil Grand Jury began investigating concerns that Banning was illegally using utility rates to raise revenue for the City's general fund.

147. The Grand Jury found that the City was operating without a strategic plan and was "experiencing a significant fiscal and administrative crisis." The Grand Jury also found broader financial and administrative problems, including blatant "breaches and disregard of policy," "an exceedingly high employee turnover rate," "failure to maintain operational integrity," and outdated and unenforced procedures that left "the City vulnerable to litigation."

148. The Grand Jury concluded that "following and updating policies and procedures is needed to ensure the City of Banning has ethical guidelines that will help rebuild internal controls and establish trust among staff, elected officials, and citizens" and that "[a]dherence to policy and current updates are necessary to maintain internal controls and safeguard public resources."

149. On information and belief, Flynn's intimidation and harassment of fellow council members and city employees and her abuse of her authority as a city council member and as mayor were significant contributing factors to the mismanagement described in the Grand Jury's report.

## FIRST CAUSE OF ACTION

## Violations of the Civil Rights Act, 42 U.S.C. Section 1983

## (Denial of Procedural and Substantive Due Process Under the Fourteenth Amendment)—Against the City of Banning and Does 1-10

150. SLH incorporates by this reference all of the above allegations as though fully set forth herein.

151. The City has intentionally deprived SLH's constitutionally protected ownership and development rights in the Banning Point property by refusing to conduct a new, fair, and unbiased hearing on the Banning Point project or on its motion for reconsideration. The Fourteenth Amendment to the U.S. Constitution provides that "[n]o State shall … deprive any person of life, liberty, or *property*, *without due process of law* … ." U.S. Const. amend. XIV, § 1 (emphasis added). "A procedural due process claim possesses two components: first, that an individual has been deprived of a constitutionally protected liberty or property interest; and second, that this deprivation … was rendered unconstitutional because it was undertaken without according the individual the appropriate hearing." *Galland v. City of Clovis*, 24 Cal. 4th 1003, 1030 (2001) (citing *Zinermon v. Burch*, 494 U.S. 113, 133 (1990)).

### A. SLH has a protected property interest in its ownership of the property and in the approval of its application.

152. SLH's ownership of the property constitutes a constitutionally protected property interest under the Fifth Amendment to the United States Constitution and Article 1 of the California Constitution. *See The Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 572-73(1972) ("[P]roperty interests protected by procedural due process [include] [. . .] actual ownership of real estate").

153. SLH also has a constitutionally protected property interest in the approval of its development application. In the context of land-use applications, the

Ninth Circuit has recognized that a constitutionally protected property interest is created where an applicant has a "reasonable expectation of entitlement" based on the language of the statute creating the property interest and "the extent to which the entitlement is couched in mandatory terms." *Wedges/Ledges of California, Inc. v. City of Phoenix, Ariz.*, 24 F.3d 56, 62 (9th Cir. 1994) (citation omitted); *see also Ass'n of Orange Cnty. Deputy Sheriffs v. Gates*, 716 F.2d 733, 734 (9th Cir. 1983). "While not every procedural statute creates entitlements, if the procedural requirements were intended to operate as a significant substantive restriction on the agency's actions, a property interest may be created." *Groten v. California*, 251 F.3d 844, 850 (9th Cir. 2001) (internal quotations omitted) (holding applicant for appraiser license alleged a legitimate claim of entitlement to the license where California regulations restricted officials' discretion to deny application); *Bateson v. Geisse*, 857 F.2d 1300, 1303 (9th Cir. 1988) (holding that applicant had protected property interest in expectation of city compliance with adopted code in connection with issuance of project permit).

154. Amendment No. 5, the Banning Municipal Code, the City Council's Manual of Procedural Guidelines, the City's previous approval of Design Review, and the Superior Court's rejection of most of PAG's challenge all led SLH to a reasonable expectation of entitlement.

**1. Amendment No. 5 itself gave SLH a reasonable expectation of entitlement:**

155. Per Amendment No. 5, a "Permitted Use … is permitted by right and may be established as the primary use of a building without the need for discretionary approval." (Ex. A, Amendment No. 5, § 2.1.1, p. 9—Allowable Land Uses).

> The letters used in Table 1 shall have the following meaning:
>
> <u>"P" - Permitted Use</u>
>
> A Permitted Use (P) is permitted by right and may be established as the primary use of a building without the need for discretionary approval.

156. Permitted uses vary by district. In the Business & Warehouse District, warehousing is permitted "by right." (Ex. A, Amendment No. 5, § 2.1.2, Table 1, p. 12 [listing "WAREHOUSING AND DISTRIBUTION" as permitted uses].)

| Land Use | Land Use District | | |
|---|---|---|---|
| | BW | OP | RS |
| **WAREHOUSING AND DISTRIBUTION** | | | |
| Internet Fulfillment, Distribution, E-Commerce | P | X | X |
| Merchant Wholesalers, Durable Goods - Limited (includes furniture and home furnishings, electronics, professional and commercial equipment and supplies, hardware, plumbing, and heating equipment and supplies) | P | X | X |
| Non-Store Retailers (includes electronic shopping and mail-order houses, vending machine operators, and other direct selling establishments, excluding fuel/petroleum dealers) | P | X | X |
| Public Storage | P | P | X |
| Warehousing and Storage (within an enclosed building) | P | X | X |

157. Amendment No. 5's approval of certain permitted uses "by right" and "without the need for discretionary approval" represents a significant limitation on the City's discretion and gave SLH the reasonable expectation that the City would approve a project conforming to the permitted uses allowed "by right" under Amendment No. 5. (*See* Ex. A, Amendment No. 5, § 2.1.1, p. 9 & § 2.1.2, Table 1, p. 12.)

158. In addition to permitted uses, Amendment No. 5 specified numerous design elements. (Ex. A., Amendment No. 5, § 3, pp. 19-29—Development Standards and Design Guidelines.) Amendment No. 5's design elements include:

- "Provide golf cart access to the Retail & Service District in coordination with street improvements on Sun Lakes Boulevard, minimize interaction between golf carts and cars, and facilitate shopping access for Sun Lakes residents." (*Id.* § 3.2.1, p. 20.)

- "Provide an on-site pedestrian circulation system that connects the three districts within the Specific Plan area to facilitate employee access to restaurants, retail, and services and to create a pedestrian amenity." (*Id.*)
- "Design drive aisles to minimize conflicts with pedestrians, provide adequate vehicle stacking space, and prevent queuing of vehicles onto public streets." (*Id.*)
- "Use landscaping within pedestrian oriented areas to provide shade, direct circulation, aid in wayfinding, and enhance visual character." (*Id.* § 3.2.3, p. 22.)
- "Provide ample shade trees and seating opportunities along the on-site pedestrian circulation system." (*Id.*)
- "Locate, design, and/or screen truck courts, dock doors, and truck parking areas so they are not visible from Sun Lakes Boulevard. Ensure that these areas are concealed while in use, including the tops of truck trailers." (*Id.* § 3.2.4, p. 24.)
- "Use evergreen screen trees along with shrubs and groundcover to create a 20-foot wide landscape buffer along the northeastern Specific Plan boundary adjacent to the existing residential parcels. Select tree species and size to ensure a solid tree screen above the existing wall within one year." (*Id.*)
- "Buffer parking lots adjacent to Sun Lakes Boulevard from street view using berms and/or landscaping a minimum of three feet high." (*Id.*)
- "Prohibit chain link fences or gates." (*Id.*)
- For the Retail & Service District, "[d]edicate and mark at least 15 percent of the required parking spaces for golf cart use. Locate and design the golf cart spaces to minimize interaction with cars." (*Id.* § 3.2.7, p. 28.)

159. In addition to designating permitted uses as approved "by right" and requiring conforming projects comply with detailed design elements, Amendment

No. 5 includes an analysis of the consistency between the amendment and the General Plan. (Ex. A, Amendment No. 5, App'x at pp. A-1 to A-6.) The analysis, which the City adopted and which was not challenged, concluded that Amendment No. 5 "*is consistent with the City of Banning General Plan*." (*Id.* at p. A-1 [emphasis added].)

160. Amendment No. 5's consistency analysis included the following finding regarding adjacent neighborhoods:

> *The provisions of the Specific Plan*, including the development standards, streetscape plan, and phasing requirements, *serve to protect the existing residential neighborhoods in the vicinity of the Specific Plan area*.
>
> The northeast boundary of the Specific Plan area abuts existing small lot residential units that are part of the Sun Lakes Country Club active adult/golf course community. The Specific Plan's Development Standards require a 50-foot building setback along the northeast perimeter to buffer the existing residences from development within the adjacent Office & Professional District. Additionally, a 20-foot wide landscape setback is required along the northeast boundary to provide screening for the existing residences. The landscape setback must include evergreen screen trees of a species and size that will result in a solid tree screen above the existing wall within one year.
>
> The Specific Plan area is also located directly across Sun Lakes Boulevard from the Sun Lakes Country Club main entrance. The Streetscape Plan Development Criteria require existing mature trees within the median

> and along the street to be preserved whenever feasible. New landscaping will also enhance entry drives into the Specific Plan area and along the street frontage. The Design Guidelines require that parking lots within the Retail Service District that front onto Sun Lakes Boulevard be screened with berms or landscaping three-feet high to protect viewsheds from the Sun Lakes Country Club community. The phasing requirements promote development within the Retail & Service District, which will be smaller scale, by requiring entitlement of the Retail & Service District prior to occupancy of the Business & Warehouse District . Thus, the smaller commercial buildings will help screen the Business & Warehouse District's larger buildings as seen from Sun Lakes Boulevard. Buildings that remain visible must demonstrate high quality architectural design and detail. Loading docks, dock doors, and semi-truck parking areas are not allowed to be visible from the street frontage.
>
> (Ex. A, Amendment No. 5, App'x at pp. A-1 to A-2 [emphasis added].)

161. Amendment No. 5's consistency analysis included the following finding regarding industrial goals and compatibility with adjacent lands:

> The Specific Plan provides for a wide range of light industrial and commercial uses in its three districts: Business & Warehouse District, Office & Professional District, and Retail & Service District. *The development standards and design guidelines included in the Specific*

> *Plan promote high quality development that limits impacts on the nearby uses.*
>
> ….
>
> The Specific Plan land uses will increase availability of goods and services for nearby residents, expand job opportunities within the area, and boost sales tax and other revenue sources for the City.
>
> The Specific Plan's Development Standards and Design Guidelines employ building setbacks and screening/buffering requirements to limit impacts on adjacent and nearby residential uses. The Design Guidelines also ensure that new development is of high quality through provisions that address architectural design, site design, and landscaping.
>
> ….
>
> (Ex. A, Amendment No. 5, App'x at p. A-3 [emphasis added].)

**2. The Banning Municipal Code gave SLH a reasonable expectation of entitlement.**

162. Municipal Code Section 17.56 contains the standards the City must consider in evaluating design review applications, and Section 16.14.050(B) sets forth the standards the City Council must consider in evaluating tentative parcel map applications.

163. ***Design Review***. The Banning Municipal Code section 17.04.070 explains that "design," as referenced in the design review process, has a specific meaning:

> Design includes the planning and engineering of the following: street alignments, grades and widths;

> drainage and sanitary facilities and utilities, including alignment and grades thereof; location and size of all required easements and rights-of-way; fire roads and fire breaks; lot size and configuration; traffic access; grading; land to be dedicated for park or recreational purposes; building and other such specific physical requirements.

164. Banning Municipal Code section 17.56.050, governing design review, states:

> Prior to making a determination, the review authority shall determine that the project adequately meets adopted City performance standards and design guidelines, based upon the following findings:
>
> A. The proposed project is consistent with the General Plan.
>
> B. The proposed project is consistent with the Zoning Ordinance, including the development standards and guidelines for the district in which it is located.
>
> C. The design and layout of the proposed project will not unreasonably interfere with the use and enjoyment of neighboring existing or future development, and will not result in vehicular and/or pedestrian hazards.
>
> D. The design of the proposed project is compatible with the character of the surrounding neighborhood.

165. As such, Banning Municipal Code section 17.56.050 limits the City's

review of development applications to specific, objective criteria. It does not permit the consideration of additional, unenumerated factors.

166. In an attempt to shoehorn her opposition into the permitted factors of Banning Municipal Code section 17.56.050, Councilmember Flynn has insisted in this litigation that the project is not consistent with the City's General Plan or Amendment No. 5 because, among other reasons, the project is not compatible "with its residential surroundings as required by Policy No. 7 of the General Plan." Policy No. 7, however, does not state that a warehouse can never be built anywhere near residential. Policy No. 7 states that "The land use map shall include sufficient industrial lands for manufacturing, warehousing and distribution, while carefully considering compatibility with adjacent lands."

167. Flynn and the City ignore that the specific plan amendment that Flynn failed to challenge already considered what development would be compatible with the General Plan and conducted an analysis specifically on its consistency with Policy No. 7 and determined that it was. (See Ex. A, Amendment No. 5, at pp. A-1 to A-3 ["As evidenced by this consistency analysis, Sun Lakes Village North Specific Plan Amendment 5 is consistent with the City of Banning General Plan."]) Amendment No. 5 further determined that its design elements would make a conforming project compatible with the surrounding area: "The Specific Plan's Development Standards and Design Guidelines employ building setbacks and screening/buffering requirements to limit impacts on adjacent and nearby residential uses. The Design Guidelines also ensure that new development is of high quality through provisions that address architectural design, site design, and landscaping." (*Id.* at pp. A-2 & A-3.)

168. As the specific plan is simply a subpart of the General Plan, the more specific provisions of Amendment No. 5 control over Councilmember Flynn's biased interpretation of the General Plan. *See, e.g.*, Cal. Gov. Code § 65450 ("After the legislative body has adopted a general plan, the planning agency may, or if so

directed by the legislative body, shall, prepare specific plans for the systematic implementation of the general plan for all or part of the area covered by the general plan."); Cal. Gov. Code § 65454 ("No specific plan may be adopted or amended unless the proposed plan or amendment is consistent with the general plan."); *see generally*, LINDGREN, ET AL., CALIFORNIA LAND USE PRACTICE § 2.55 H. Consistency with General Plan (CEB, 2025 Update); *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 170 (2007) (explaining the general maxim that where there is a conflict between a general and a specific provision, the specific provision will prevail). And again, Flynn failed to challenge the specific plan amendment when implemented, and there is no provision in any governing document or statute that allows Design Review to be used to retroactively overturn the unchallenged amendment. Flynn's conduct thus evidences retaliatory intent to punish SLH for participating in the process of amending the specific plan and for daring to submit for Design Review a project compliant with that plan.

169. ***The tentative parcel map application***. Banning Municipal Code section 16.14.050, regarding the approval of tentative parcel maps, states:

> A. At the next regular meeting of the city council following the filing of the planning commission's report, the city council shall fix the meeting date at which the tentative map will be considered by it, which date shall be within thirty days thereafter. After a public hearing, the city council shall approve, conditionally approve, or disapprove the tentative map within that thirty-day period.
>
> B. Upon conclusion of the hearing, the city council shall, within ten days, declare its findings. Any action taken by the city council shall be supported by the findings required by Sections 66427.1, 66473.5, 66474,

66474.1 and 66474.6 of the California Government Code and Section 21100 of the California Public Resources Code.

170. The California Government Code and California Public Resources Code sections referenced in Banning Municipal Code section 16.14.050(B) govern the considerations that may be considered when the City Council takes action on a tentative parcel map.

171. California Government Code section 66427.1 relates to the conversion of residential real property into a condominium project, community apartment projects, and stock cooperative projects.

172. California Government Code section 66473.5 states: "No local agency shall approve a tentative map, or a parcel map for which a tentative map was not required, unless the legislative body finds that the proposed subdivision, together with the provisions for its design and improvement, is consistent with the general plan required by Article 5 (commencing with Section 65300) of Chapter 3 of Division 1, or any specific plan adopted pursuant to Article 8 (commencing with Section 65450) of Chapter 3 of Division 1. A proposed subdivision shall be consistent with a general plan or a specific plan only if the local agency has officially adopted such a plan and the proposed subdivision or land use is compatible with the objectives, policies, general land uses, and programs specified in such a plan."

173. California Government Code section 66474 states: "A legislative body of a city or county shall deny approval of a tentative map, or a parcel map for which a tentative map was not required, if it makes any of the following findings: (a) That the proposed map is not consistent with applicable general and specific plans as specified in Section 65451. (b) That the design or improvement of the proposed subdivision is not consistent with applicable general and specific plans. (c) That the site is not physically suitable for the type of development. (d) That the site is

not physically suitable for the proposed density of development. (e) That the design of the subdivision or the proposed improvements are likely to cause substantial environmental damage or substantially and avoidably injure fish or wildlife or their habitat. (f) That the design of the subdivision or type of improvements is likely to cause serious public health problems. (g) That the design of the subdivision or the type of improvements will conflict with easements, acquired by the public at large, for access through or use of, property within the proposed subdivision. In this connection, the governing body may approve a map if it finds that alternate easements, for access or for use, will be provided, and that these will be substantially equivalent to ones previously acquired by the public. This subsection shall apply only to easements of record or to easements established by judgment of a court of competent jurisdiction and no authority is hereby granted to a legislative body to determine that the public at large has acquired easements for access through or use of property within the proposed subdivision."

174. California Government Code section 66474.1 states: "A legislative body shall not deny approval of a final or parcel map if it has previously approved a tentative map for the proposed subdivision and if it finds that the final or parcel map is in substantial compliance with the previously approved tentative map."

175. California Government Code section 66474.6 states: "The governing body of any local agency shall determine whether the discharge of waste from the proposed subdivision into an existing community sewer system would result in violation of existing requirements prescribed by a California regional water quality control board pursuant to Division 7 (commencing with Section 13000) of the Water Code. In the event that the governing body finds that the proposed waste discharge would result in or add to violation of requirements of such board, it may disapprove the tentative map or maps of the subdivision."

176. Section 21100 of the California Public Resources Code is a key provision of CEQA and requires the creation of environmental impact reports.

177. When Flynn and the rest of the City Council disapproved of SLH's tentative parcel map on September 10, 2024, and later denied reconsideration on October 8, 2024, they did not limit their analysis to the criteria enumerated in Banning Municipal Code section 16.14.050(B) and the California Code sections referenced therein. Instead, the City Council merely repeated its (wrong) conclusion that the parcel map was inconsistent with the general plan and Amendment No. 5 and did not even make findings on the other criteria required by Banning Municipal Code section 16.14.050.

178. The Banning Municipal Code sections governing design review and tentative parcel maps are couched in mandatory and limiting terms, significantly restricting the City's decision making, as they require the City to consider only the specific factors in determining whether to approve or deny the respective design review and tentative parcel map applications. The City's adherence to these substantive "checks" on its review and approval of SLH's applications establishes a "reasonable expectation" of entitlement to the approval of its development application, especially given the City's prior approval of SLH's development application under these standards and the Superior Court's rejection of PAG's challenges to the review (other than as to the final vote including then-Councilmember Hamlin).

179. In addition to the Banning Municipal Code sections governing design review and tentative parcel map approvals, Banning Municipal Code section 17.48.020, governing filing procedures for, among other things, permits, states: "Requests for permits and other regulatory determinations must be processed fairly, and evenhandedly, and in a way that puts all applicants on an equal footing with one another. Steps in the application process should be clearly laid out, and adhered to by staff as well as by the applicant, so that due process is provided. Both applicants and the public need to have a level of comfort in the process, and a level of confidence that reasonable and predictable outcomes will be achieved."

SLH expected that the City would comply with this section and treat SLH and its application fairly, but the City did not.

**3. The Banning City Council's Manual of Procedural Guidelines gave SLH a reasonable expectation of entitlement.**

180. City Councilmembers are governed by the "Manual of Procedural Guidelines for the Conduct of City Council and Constituent Body/Commission Meetings for the City of Banning." Banning Municipal Code § 2.04.080 (stating that the Manual "shall govern the conduct and procedures applicable to meetings of the city council and related city bodies, boards and commissions").

181. The City Council Manual states: "For quasi adjudicative matters involving public hearings, the members of the Legislative Body shall not prejudice the matter prior to the public hearing, shall be fair and impartial, and shall decide the matter based upon the evidence and the statutorily required findings ... For such matters, Legislative Body members *should avoid expressing an opinion or divulging their thought process until after the public hearing has been completed*." City Council Manual § 7.1(d), (e) (emphasis added).

182. SLH expected that the City Council would follow this provision and approach its application fairly, without divulging its views or thought processes prior to making a decision. But Flynn, as City Councilmember, did not follow these provisions of the City Council Manual. Instead, she was not fair and impartial and publicly expressed her opinion on the project prior to both the September 10 and October 8, 2024 public hearings, including by speaking at a July 3, 2024 PAG meeting and encouraging members to oppose the project.

**4. The City's prior approval, and the Superior Court's finding that that approval was supported by substantial evidence, gave SLH a reasonable expectation of entitlement.**

183. In 2022, the City approved the very project SLH is trying to move forward with. The City adopted a detailed amendment to the governing specific

plan in consultation with SLH and contemplating its development of the property via the project now at issue. Neither Flynn nor PAG challenged this amendment to the specific plan, which, again, was designed to pave the way for the project now at issue in this litigation. The City then issued a detailed approval of SLH's project, the findings supporting which were subsequently validated and upheld by the Superior Court in the PAG litigation. It is only the City's subsequent unconstitutional conduct—undertaken once Flynn and PAG/the Sun Lakes community installed themselves on the City Council—that has deprived SLH of the ability to move forward with its previously entitled project.

184. Indeed, the City Council's prior approval of the tentative parcel map and design review for the project illustrates SLH's "reasonable expectation" of entitlement. And when Flynn and PAG challenged that entitlement, the Riverside County Superior Court adjudged that substantial evidence supported the City Council's findings and approval of the project. *See Pass Action Group v. City of Banning*, No. CVRI2201482, Ruling on Submitted Matter—Petition for Writ of Mandate/Complaint for Injunctive Relief at 7 (Riverside Cnty. Super. Ct. Mar. 15, 2024) ("City's conclusion that the Project is consistent with the general plan and specific plan amendment is supported by substantial evidence."). Although it vacated the project approval on other grounds completely unrelated to the adequacy of the City's findings or the project's environmental review, there was no doubt that an unbiased City Council would take the same action it previously had: approve the project. This, on information and belief, spurred Flynn and PAG to subvert the will of the rest of the City's residents by installing themselves on the City Council to further the Sun Lakes community's agenda to prevent development of SLH's property so the City could bank it for use as a park or other future amenity of the Sun Lakes community —an agenda that Flynn and the Sun Lakes community could not achieve by constitutional means.

185. In short, SLH's expectation of entitlement stems not only from its

ownership of the property but also, in part, from the fact that the project was entirely consistent with Amendment No. 5, the City Council already determined that the project satisfied the requirements for approval under both the City's Municipal Code and CEQA, the Superior Court upheld those actions, and SLH would be entitled to a fair hearing on its design review and tentative parcel map applications and a decision based on the enumerated factors in the Banning Municipal Code. Nothing had changed since that original approval, except for Flynn's new position as a government official.

186. Accordingly, SLH has a constitutionally protected property interest in the approval of its development application.

**B. The City's review of SLH's applications was constitutionally inadequate and unfair as it deprived SLH of a meaningful opportunity to be heard before an unbiased decisionmaker.**

187. "[B]ias—either actual or an 'unacceptable probability' of it—alone is enough on the part of a municipal decision maker is to show a violation of the due process right to fair procedure." *Woody's Grp., Inc. v. City of Newport Beach*, 233 Cal.App.4th 1012, 1022 (2015). "The law does not require the disappointed applicant to prove actual bias. Rather, there must not be 'an unacceptable probability of actual bias' on the part of the municipal decision maker." *Id.* (internal quotations omitted). A decision-maker does not have to be completely indifferent to the general subject matter of the issue or project presented in order to be impartial. *Andrews v. Agricultural Labor Relations Bd.*, 28 Cal.3d 781, 790 (1981). But "'[a]"fair trial in a fair tribunal is a basic requirement of due process…'" *Bullock v. City and County of San Francisco*, 221 Cal.App.3d 1072, 1091 (1990) (abrogated on unrelated grounds in *Griset v. Fair Pol. Pracs. Comm'n*, 25 Cal.4th 688, 698 (2001)); *Nasha v. City of Los Angeles*, 125 Cal. App. 4th 470, 482-83 (2004). A biased decisionmaker is "constitutionally unacceptable." *Bullock*, 221 Cal.App.3d at 1091. "The right to a fair procedure includes the right

to impartial adjudicators." *Rosenblit v. Superior Court*, 231 Cal.App.3d 1434, 1448 (1991); *Galland*, 24 Cal.4th at 1031, 1034 ("[t]he Due Process Clause is intended to prevent government officials from abusing [their] power or employing it as an instrument of oppression.").

188. The trial court in the PAG litigation reaffirmed these principles in directing that the one Councilmember—Hamlin—who it found to be potentially biased should not be part of the re-vote. PAG managed to thwart that directive's intent by ensconcing its own leader onto the Council and the City then allowing a truly biased vote to occur.

189. As described above, SLH is informed and believes that Councilmember Flynn's years-long advocacy on behalf of PAG before the July 9, 2024, public hearing, including as described in detail above, establish and confirm the existence of her predisposition and bias against the Banning Point project. In short, Councilmember Flynn had become personally embroiled in the issues. The City's actions in permitting Councilmember Flynn (1) to participate in the July 9, 2024, public hearing, (2) to allow Councilmember Flynn to vote on the project entitlements on September 10, 2024, and (3) to allow Flynn to participate in deliberations over SLH's request for reconsideration (apparently persuading her Council colleagues not to grant that request for reconsideration after a motion had already been made and seconded), resulting in the City Council's October 8, 2024 denial of SLH's request for reconsideration, intentionally deprived SLH of its constitutional right to a fair hearing before an unbiased decisionmaker.

190. And, the conduct of the City's Councilmembers is governed by Banning Municipal Code and the "Manual of Procedural Guidelines for the Conduct of City Council and Constituent Body/Commission Meetings for the City of Banning." Banning Municipal Code § 2.04.080 (stating that the Manual "shall govern the conduct and procedures applicable to meetings of the city council and related city bodies, boards and commissions"). The City's actions violated these

standards too.

191. The City Council manual states: "For quasi adjudicative matters involving public hearings, the members of the Legislative Body shall not prejudice the matter prior to the public hearing, shall be fair and impartial, and shall decide the matter based upon the evidence and the statutorily required findings ... For such matters, Legislative Body members *should avoid expressing an opinion or divulging their thought process until after the public hearing has been completed*." City Council Manual § 7.1(d), (e) (emphasis added).

192. Banning Municipal Code section 17.48.020, governing filing procedures for, among other things, permits, states: "Requests for permits and other regulatory determinations *must be processed fairly, and evenhandedly, and in a way that puts all applicants on an equal footing with one another*. Steps in the application process should be clearly laid out, and adhered to by staff as well as by the applicant, *so that due process is provided. Both applicants and the public need to have a level of comfort in the process, and a level of confidence that reasonable and predictable outcomes will be achieved*." (Emphasis added.)

193. Further, the right to be free from the government's deliberate disregard of substantive due process rights was clearly established law at the time of the City's actions complained of herein. *Galland*, 24 Cal.4th at 1031, 1034 ("[t]he Due Process Clause is intended to prevent government officials from abusing [their] power or employing it as an instrument of oppression"); *see also Galland* Court's approval of *Mission Springs v. City of Spokane*, 134 Wash. 2d 947 (1998); *see also, e.g., Lingle v. Chevron, U.S.A., Inc.*, 544 U.S. 528 (2005) (unanimously clarifying the distinction between takings jurisprudence and due process jurisprudence); *Bateson*, 857 F.2d at 1303 (city's failure to comply with its own Code gave rise to substantive due process violation).

194. SLH is informed and believes and based thereon alleges that the City's and Flynn's actions alleged herein were an egregious, arbitrary, irrational, and

capricious administration of applicable laws and policies.

195. Such flouting of the laws by the City did not substantially advance any legitimate State interest and is not substantially or reasonably related to the public health, safety, or general welfare. Nor could such action substantially advance any legitimate State interest.

196. Because of the City's acts, omissions, and conduct, the City has wrongfully and intentionally deprived SLH of its constitutionally protected property interests, including its development rights in the Banning Point property.

197. As a direct and proximate result of the City's intentional, unconstitutional actions and egregious conduct in flouting these well-established laws and regulations, SLH has suffered and will continue to suffer significant monetary damages. SLH's total damages are in an amount not yet determined, but in excess of $25,000,000. In addition, SLH has incurred and will continue to incur attorneys' fees for the prosecution of this action, which fees are recoverable under 42 U.S.C. section 1988 and California Code of Civil Procedure, sections 1021.5 and 1036.

**SECOND CAUSE OF ACTION**

**Violations of the Civil Rights Act, 42 U.S.C. Section 1983 (Retaliation)—Against The City of Banning, Sheri Flynn (Individually), and Does 1-10**

198. SLH incorporates by this reference all of the above allegations as though fully set forth herein.

199. "It is clear that '[s]tate action designed to retaliate against and chill political expression strikes at the heart of the First Amendment.'" *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989) (internal citations omitted). "There is no dispute that" SLH "has a protected interest in commenting on the actions of government officials." *Id.* And "[t]he right of access to the courts is subsumed under the first amendment right to petition the government for redress

of grievances. [. . .] Deliberate retaliation by state actors against an individual's exercise of this right is actionable under section 1983." *Id.* (citations omitted). Particularly at the pleadings stage, retaliatory intent may be inferred from circumstantial evidence such as the chronology of events. *Capp v. Cnty. of San Diego*, 940 F.3d 1046, 1055 (9th Cir. 2019)

200. Thus, a state actor, including individual Councilmembers such as Flynn, can be liable for retaliation under section 1983 where the plaintiff has engaged in constitutionally protected activity, the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity, and the protected activity is a substantial motivating factor in the defendant's conduct. *See Soranno's Gasco, Inc.*, 874 F.2d at 1314; *see also Verdun v. City of Santa Paula*, 2024 WL 4839797, at **6-7 (C.D. Cal. Nov. 18, 2024). But the plaintiff need not demonstrate that its speech was *actually* suppressed or inhibited. *Verdun*, 2024 WL 4839797, at *6.

201. SLH exercised its clearly established constitutional right under the First Amendment to advocate for its project and to participate in defending against PAG's litigation in state court. Prior to PAG's initiation of litigation, SLH and its representatives openly advocated for the Banning Point project in front of the Planning Commission and at City Council meetings, and SLH otherwise participated in the political process to advocate for its project.

202. On information and belief, Flynn opposed the Banning Point project so vehemently that her opposition to the project became personal and, in addition to simply opposing the project, she became hateful toward SLH as well. She accused SLH of being dishonest, stated publicly that she would put nothing past supporters of the project to do whatever needed to be done to get what they want, and accused SLH (*falsely*) of trying to buy councilmember votes for the project. In other words, Flynn developed a personal animus toward both the project and SLH.

203. In retaliation for SLH's participation in the PAG litigation and

advocacy for its project before the City Council, Flynn, after driving Councilmember Hamlin out of town and enthroning herself on the City Council in Hamlin's place, wielded the power of the City to retaliate against SLH, denying SLH's previously approved project on September 10, 2024, and denying SLH's request for reconsideration on October 8, 2024. SLH's participation in the PAG litigation and its advocacy for the project were a substantial or motivating factor in the City and Flynn's conduct. In view of the City Council's originally having approved the project, and City staff's recommendations to reapprove the project, there is no doubt that the City Council would have again approved the project but for Flynn's bias and cajoling the City Council to follow her will.

204. And, as explained above, Flynn's attempt to work around her failure to challenge the amendment to the specific plan by later tainting the project's Design Review further evidences retaliatory intent to punish SLH for participating in the process of amending the specific plan and for daring to submit for Design Review a project compliant with that plan.

205. It can hardly be disputed that at the time of the City Council's action SLH "had a clearly established constitutional right to be free of intentional retaliation by government officials based upon [its] constitutionally protected expression." *Soranno's Gasco*, 874 F.2d at 1319 (citations omitted).

206. In taking these actions and causing the City to retaliate against SLH, Flynn acted in wanton, malicious disregard for SLH's clearly established constitutional rights. Flynn openly flaunted her intent to do so in, for example, the July 9 meeting and in the pre-meeting with PAG in which she coached PAG members on how to help cajole the other Councilmembers into voting against the project.

207. Flynn's, and in turn, the City's actions are the sort that would chill a person of ordinary firmness from continuing to engage in the protected activity. SLH expects that, through discovery, it will have sufficient evidence to pursue

punitive damages against Flynn and will then seek leave to amend to add punitive damages to SLH's prayer for relief.

208. Further, as noted above, the conduct of the City's Councilmembers is governed by the "Manual of Procedural Guidelines for the Conduct of City Council and Constituent Body/Commission Meetings for the City of Banning." Flynn's actions—and the Council's actions following her lead—directly violated these mandatory principles.

209. As a direct and proximate result of the City's and Flynn's and Does 1-10's unconstitutional actions and egregious conduct in flouting these well-established laws and regulations, SLH has suffered and will continue to suffer significant monetary damages. SLH's total damages are in an amount not yet determined, but in excess of $25,000,000. In addition, SLH has incurred and will continue to incur attorneys' fees for the prosecution of this action, which fees are recoverable under 42 U.S.C. section 1988 and California Code of Civil Procedure, sections 1021.5 and 1036.

## THIRD CAUSE OF ACTION

### Violation of the Civil Rights Act, 42 U.S.C. Section 1983

### (De Facto Taking)—Against The City of Banning and Does 1-10

210. SLH incorporates by this reference all above allegations as though fully set forth herein.

211. Over the course of decades, as described above, the City—first under the outsize influence of the Sun Lakes community when the City's elections were at large and now under the control of Flynn and her PAG/Sun Lakes community contingency—has undertaken a scheme to prevent development of the Banning Point project and unconstitutionally, inversely condemn/de facto take and preserve it in perpetuity in an undeveloped state, banking it for a future use as an amenity to the City and the Sun Lakes community, without the City's paying just compensation, and as a result of the City's acts, omissions, and conduct, SLH has

been damaged, and the City has unconstitutionally, de facto taken SLH's property.

212. The City has ignored its obligations under the United States Constitution and the California State Constitution to provide just compensation.

213. Inverse condemnation/de facto-physical takings cases have been recognized by the California courts for more than 40 years. *See, e.g.*, *People ex rel. Dep't of Transp. v. Diversified Properties Co. III*, 14 Cal.App.4th 429, 442-43 (1993) (The court found a de facto taking had occurred where a city and the State "cooperated" with each other with respect to the non-development of the landowner's property where a freeway route was imposed on the landowner's development plans); *Jones v. People ex rel. Dep't of Transp.*, 22 Cal.3d 144, 149 (1978) (State and City entered into a freeway agreement affecting plaintiffs' land. Court determined that the City's denial of access to plaintiffs' land as a result of this agreement was a taking because the state's plans effectively denied landowners' right to subdivide their land by depriving them of access required for such subdivision); *Taper v. City of Long Beach*, 129 Cal.App.3d 590 (1982) (City rejected development approval "because of the public demand that City acquire the property for a public park").

214. As described above, for years the City, under the Sun Lakes community's outsized influence, has prevented any development of the Banning Point project, including by rejecting every project SLH or its affiliates have proposed, including projects for which the property was specifically zoned. Only when the Sun Lakes community briefly lost its grip over the City via the adoption of by-district elections did the City approve the project.

215. Most recently, as described above, the City, at Flynn's and PAG/the Sun Lakes community's urging, reneged on SLH's previously approved project, refusing to re-approve a project that it previously had approved and that the Superior Court in the PAG litigation found had been appropriately reviewed, and then denied reconsideration of the denial on October 8, 2024.

216. Flynn has repeatedly expressed her view that the property should never be used for warehousing and should instead be used for amenities for the Sun Lakes community, such as a park, skating rink, restaurants, or retail. Flynn herself has acknowledged that there is at least a perception that PAG wants to keep the property vacant for its own benefit and for the benefit of Sun Lakes residents.

217. These actions, and the fact that the City will not permit the site to be developed even for the purpose for which the City designated it demonstrates that the City simply will never allow an economically viable use for SLH's property, as it desires instead to bank the property for the Sun Lakes community's future use. And this will not change so long as Flynn—whose bias is on record many times over—continues to control the levers of the City's government.

218. As described above, SLH's affiliates have attempted to develop the property since at least 2011 for many uses besides warehouse use, including for retail, theater, health club, auto dealership, housing, and office space. None of these attempts have resulted in a viable project.

219. Because of the City's acts, omissions, and conduct, the City has wrongfully deprived SLH of any reasonably economically viable use for the Banning Point property. The City's actions, in blocking development of the property for decades and then approving development only to renege on that approval, have rendered the property unmarketable, and otherwise damaged the Banning Point property and SLH. Flynn has made clear that she will not allow any economically viable development of the property. Flynn ran for office on a platform of refusing to approve or allow *any* warehouses (despite that being precisely what the amended specific plan allows) in residential communities. And, as admitted in her verified interrogatory responses in this litigation, she considers development of the Banning Point property to be incompatible "with its residential surroundings," referring to Sun Lakes.

220. The City's actions amount to an unconstitutional, de facto seizure,

banking, and taking and damaging of the Banning Point property, and for which the City has paid no compensation, all in violation of SLH's constitutional right to be paid just compensation. In particular, as the U.S. Supreme Court explained in a June 2019 opinion "a taking without compensation violates the self-executing Fifth Amendment at the time of the taking," and thus the constitutional violation takes place when property is taken without compensation, not after the exhaustion of state court remedies. *Knick v. Twp. of Scott, Pennsylvania*, 139 S.Ct. 2162, 2172 (2019). The Court used this analogy:

> A bank robber might give the loot back, but he still robbed the bank. The availability of a subsequent compensation remedy for a taking without compensation no more means there never was a constitutional violation in the first place than the availability of a damages action renders negligent conduct compliant with the duty of care.

221. As a direct and proximate result of the City's and Does 1-10's unconstitutional actions and egregious conduct in flouting these well-established laws and regulations, SLH has suffered and will continue to suffer significant monetary damages. SLH's total damages are in an amount not yet determined, but in excess of $25,000,000. In addition, SLH has incurred and will continue to incur attorneys' fees for the prosecution of this action, which fees are recoverable under 42 U.S.C. section 1988 and California Code of Civil Procedure, sections 1021.5 and 1036.

**FOURTH CAUSE OF ACTION**

**(Declaratory Relief)—Against The City of Banning and Does 1-10**

222. An actual controversy has arisen between SLH, on the one hand, and the defendants, on the other hand, regarding the duties and obligations of the defendants under the law. Among other things, SLH contends and, on information and belief, the defendants dispute that:

5. The actions of the City have resulted in Civil Rights Act violations because the City:

(1) denied SLH procedural and substantive due process and the right to a fair hearing by (a) permitting Councilmember Flynn to participate in the July 9, 2024, public hearing, (b) allowing Councilmember Flynn to vote on the project entitlements on September 10, 2024, and (c) allowing Councilmember Flynn to participate in the deliberation over SLH's request for reconsideration, resulting in the October 8, 2024, denial of the request for reconsideration,

(2) retaliated against SLH, in violation of its First Amendment rights, for its advocacy and participation in litigation and for advocating for the development of the Banning Point property, and

(3) *de facto* took and banked SLH's property without just compensation.

223. SLH seeks a judicial declaration of the rights and duties of SLH and the defendants with respect to the claims and contentions alleged in paragraph 222 above. Such declaration is necessary and appropriate at this time so that the respective rights and obligations of the parties are ascertained. A judicial declaration is also required because SLH has suffered and will continue to suffer damages from the defendants' actions or lack thereof.

224. To the extent SLH has an obligation to exhaust administrative remedies in connection with the City's denial of entitlements for the Banning Point project, SLH did so several times including, but not limited to, having SLH's attorneys engage in written correspondence with the City and submitting SLH's request for reconsideration of the adoption of Resolution 2024-151 under Municipal Code section 17.68.140. The City denied SLH's reconsideration request, largely at Flynn's behest.

225. Thus, to the extent any other administrative remedies might be

available to SLH, attempting them would be a futile exercise, especially in light of Flynn's continued influence over the City Council and reelection as a councilmember; the City is single-minded in its efforts to prevent development of the Banning Point project.

## PRAYER FOR RELIEF

WHEREFORE, Sun Lakes Highland, LLC prays for judgment against the defendants as follows:

**On the first cause of action:**

1. For a determination that the actions of the City have resulted in Civil Rights Act violations because the City denied SLH procedural and substantive due process by permitting Councilmember Flynn to participate in the July 9, 2024, public hearing, allowing Councilmember Flynn to vote on the project entitlements on September 10, 2024, and allowing Councilmember Flynn to participate in the deliberation over SLH's request for reconsideration, resulting in its October 8, 2024, denial.

2. For compensation and damages against the City in an amount according to proof, but in excess of $25,000,000, with interest on that amount at the appropriate legal rate from the date of the actions giving rise to this claim;

3. For costs, including, but not limited to, reasonable attorneys' fees as allowed under 42 U.S.C. section 1988 and California Code of Civil Procedure sections 1021.5 and 1036, and otherwise;

**On the second cause of action:**

1. For a determination that the actions of the City and Flynn have resulted in Civil Rights Act violations because the City and Flynn retaliated against SLH for advocating for its project, defending itself in the PAG litigation, and attempting to develop its property, by permitting Councilmember Flynn to participate in the July 9, 2024, public hearing, allowing Councilmember Flynn to vote on the project entitlements on September 10, 2024, and allowing

Councilmember Flynn to participate in the deliberation over SLH's request for reconsideration, resulting in its October 8, 2024, denial.

2. For compensation and damages against the City in an amount according to proof, but in excess of $25,000,000, with interest on that amount at the appropriate legal rate from the date of the actions giving rise to this claim;

3. For costs, including, but not limited to, reasonable attorneys' fees as allowed under 42 U.S.C. section 1988 and California Code of Civil Procedure sections 1021.5 and 1036, and otherwise;

**On the third cause of action:**

1. For a determination that the actions of the City have resulted in Civil Rights Act violations because the City has *de facto* taken and banked SLH's property without just compensation.

2. For compensation and damages against the City in an amount according to proof, but in excess of $25,000,000, with interest on that amount at the appropriate legal rate from the date of the actions giving rise to this claim;

3. For costs, including, but not limited to, reasonable attorneys' fees as allowed under 42 U.S.C. section 1988 and California Code of Civil Procedure sections 1021.5 and 1036, and otherwise;

**On the fourth cause of action:**

1. That the rights, duties, and liabilities between SLH and the defendants be fully determined and declared by this Court, including a declaration stating the following:

(a) That the City violated SLH's procedural and substantive due process rights by permitting Councilmember Flynn to participate in the July 9, 2024, public hearing, allowing Councilmember Flynn to vote on the project entitlements on September 10, 2024, and allowing Flynn to participate in the October 8, 2024, decision regarding SLH's request for reconsideration, resulting

in the denial of that request;

(b) that the City and Flynn, in violation of SLH's First Amendment rights, retaliated against SLH for its advocacy and participation in litigation and for advocating for development of the Banning Point property, and

(c) that the City de facto took and banked SLH's property without just compensation.

2. For costs, including, but not limited to, reasonable attorneys' fees as allowed under 42 U.S.C. section 1988 and California Code of Civil Procedure, sections 1021.5 and 1036, and otherwise.

**On all causes of action in the complaint:**

1. For costs of suit incurred in this litigation; and
2. For all such other and further relief as the Court deems just and proper.

Dated: November 18, 2026

ALLEN MATKINS LECK GAMBLE
MALLORY & NATSIS LLP
K. ERIK FRIESS
ANDREW A. WOOD
CATRIONA M. LAVERY
LUCAS A. URGOITI

By: [signature]
K. ERIK FRIESS
Attorneys for Plaintiff
SUN LAKES HIGHLAND, LLC

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Sun Lakes Highland, LLC demands a jury trial in this action on all issues so triable.

Dated: November 18, 2026

Respectfully submitted,

ALLEN MATKINS LECK GAMBLE
MALLORY & NATSIS LLP
K. ERIK FRIESS
ANDREW A. WOOD
CATRIONA M. LAVERY
LUCAS A. URGOITI

By: ______________________________
K. ERIK FRIESS
Attorneys for Plaintiff
SUN LAKES HIGHLAND, LLC